Gwynn H. GILLIAM, Plaintiff,

v.

CITY OF OMAHA, a Municipal Corporation, et al., Defendants.

Civ. No. 71-0-155.

United States District Court,
D. Nebraska.

Jan. 27, 1975.

844

Benjamin M. Wall, Omaha, Neb., for plaintiff.

Kent N. Whinnery, Asst. City Atty., for defendants.

## MEMORANDUM

RICHARD E. ROBINSON, Senior District Judge.

This matter is before the Court after trial to the Court without a jury. Jurisdiction is invoked under 28 U.S.C. A. § 1343(3) (1962) and 28 U.S.C.A. § 1331 (1966). In this action the plaintiff, a black woman, contends that her civil rights have been violated and she seeks redress under Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d (1974), which provides in part that:

"No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

## FACTS

The Neighborhood Youth Corp. (NYC) was established by the Depart-ment of Labor pursuant to the Economic Opportunity Act of 1964, Pub.L. No. 88–452, Title I, § 111, 78 Stat. 512. Its purpose was to provide for the establishment of community based orgainizations to help economically and socially disadvantaged youths break out of the poverty cycle by encouraging them to complete their primary education and providing them with salable skills. 1964 U.S.Code Cong. & Admin.News, p. 2904 et seq.

In 1966 the Mayor and Council of the City of Omaha (City) applied for authorization to sponsor an NYC program in Omaha. (Exhibit 29). Their application was favorably received by the Department of Labor and a contract was entered into between the City and the federal government through its local representative, Greater Omaha Community Action (G.O.C.A.) calling upon the City to establish and administer an NYC program out of the Mayor's office under the general supervision of G.O.C.A. (Exhibits 15:29; 29A). The doors of the local program opened in late 1966 or early 1967 and after an initial period of reorganization the program assumed its permanent character prior to December of 1967.

Since many of the people who enrolled in the NYC program had personal and practical problems which jeopardized their efforts to establish a successful employment relationship, counselling services were provided to aid and support the enrollees during their participation in the training program. In December of 1967 it became necessary to increase the counselling staff of the local program from two to three. The plaintiff, who was a college graduate with limited work experience in this field, applied and was accepted for this position.[1] It is her contention that over the period of the next two and one-half

---

1. The plaintiff graduated from college in August of 1967. Her major fields of study were sociology and psychology. (Exhibit 2). Starting prior to her graduation and continuing until September of 1967 the plaintiff was employed by Opportunity Industrializa-tion Center (O.I.C.) as a counsellor. From September until December of 1967 the plaintiff was employed by Greater Omaha Community Action (GOCA) as a "community organizer". (T. 39:11).

years she was the victim of racial and sexual discrimination practiced by the defendants, Program Director, Mayor and City of Omaha.

It is her first contention that because of her race and sex she was denied a promotion to the position of "Department Director" or "Chief Counsellor" after that position became vacant during the summer of 1969.[2]

When the plaintiff joined the local program, the senior staff counselor, Mr. Colgon, appeared to exercise certain administrative and/or supervisory powers which led the plaintiff to believe that he was the program's Chief Counsellor. The plaintiff testified that she received supervision from Mr. Colgon and, in turn, reported her professional activities back through him. (T. 46:22). The contract between the City and the federal government provided for the appointment of a Chief Counsellor, (Exhibit 15, § 9) however, the precise nature and character of Mr. Colgon's authority was never fully revealed at trial. In the absence of any evidence to indicate that Mr. Colgon was officially appointed Chief Counsellor, it would appear from certain of the exhibits that limited and, largely undefined authority was informally delegated to him by the Program Director because he was the senior member of the counselling staff. (Exhibit 1, 99:35).

During the summer, enrollment in the NYC program would dramatically expand.[3] In order to handle the increased workload, the program would employ several temporary counsellors,[4]

and establish an auxiliary NYC office at Offutt Air Force Base. During the summers of 1968 and 1969 the plaintiff was placed in immediate charge of the auxiliary office by the Program Director. As such, she supervised the activities of several temporary counsellors. Though she was still subject to the authority of her Program Director, she was not required to report to her duties at the main NYC office as she was, to a large extent, permitted to administer the auxiliary office as she saw fit.

Mr. Colgon resigned during the plaintiff's second summer with the Offutt program. It is difficult to determine the precise chronology of events, which followed, but shortly after his resignation two things happened. The Program Director delegated at least a portion of Mr. Colgon's authority to a Mr. Cuevas, who was then the counsellor next most senior to the plaintiff. (Exhibit 1, 100:11). At or about this same time the plaintiff asked to be promoted to the position of Chief Counsellor and was refused by the Program Director for the avowed reasons that the services of a Chief Counsellor were not desired at that time, (T. 51:10) and because it was necessary to the continuity of the Offutt program for the plaintiff to remain at her present duties. (Exhibit 1, 100:10). In light of these events and certain other testimony by the plaintiff it would seem that when she asked to be promoted to the position of Chief Counsellor she thought she was seeking a promotion to the position vacated by Mr. Colgon.[5] However, her request was un-

2. At trial the parties referred to the disputed position as "Department Director". Although there is no provision in the contract for the appointment of a Department Director, there is a provision permitting the appointment of a "Chief Counsellor". (Exhibit 15, § 9). The Court has no basis for distinguishing between these two positions and, accordingly, has treated them as one and the same.

3. There is testimony to suggest that enrollment in the program may have doubled or tripled during the period of May through September.

4. The evidence would indicate that Mr. Colgon was primarily responsible for the supervision of the temporary counsellors assigned to the main office of the NYC program.

5. It is quite clear from the evidence that plaintiff was under the impression that Mr. Colgon occupied an official supervisory post with the local program. Not only does she give his former position a title, but her testimony implicitly suggests that he was paid salary on a scale which was different from the other staff counsellors. As will be discussed, *infra*, it is apparent that Mr. Col-

derstood by the Program Director to be either (1) a request for promotion to the official position of Chief Counsellor, which had never been filled, and for which no applications had been solicited; or (2) a request for promotion to the unofficial former position of Mr. Colgon which carried with it neither financial nor other tangible benefit.

At the end of the summer of 1969 when the plaintiff returned to her regular duties at NYC's main office, the duties of the counselling staff were not redistributed. Mr. Cuevas, who had undertaken Mr. Colgon's supervisory duties, apparently continued in that capacity, although there is no suggestion that the plaintiff received supervision from, or reported to, Mr. Cuevas on a regular or irregular basis. The only suggestion in the evidence that Mr. Cuevas exercised any extraordinary authority over the other staff counsellors is found in Exhibits 24 and 25 which are documents naming Mr. Cuevas temporarily "in charge" of the NYC office during two brief absences of the Program Director. The foregoing constitutes the operative facts of the first issue raised in the plaintiff's complaint.

The plaintiff also contends that because of her race and sex she was denied raises in salary which were comparable to the raises given to other counsellors with less education and less seniority than the plaintiff.

The evidence establishes that the plaintiff was hired in December of 1967 at the rate of $600 per month and that she received only one raise of $25 per month in December of 1968. (Exhibit 2). It has also been established that the plaintiff was the only counsellor hired between December of 1967 and April of 1970 who was black, female, and had a college degree.

Two other counsellors were hired during this period of time. The first, hired in September of 1968 at a rate of $550 per month, was of Mexican-American descent. This counsellor received raises totaling $75 per month by the first anniversary of his employment. (Exhibit 3).

The second counsellor, hired in March of 1969 at the rate of $550 per month, was of American-Indian descent. He, too, had received raises totaling $75 per month by the end of his first year of employment. (Exhibit 31). Consequently, by March of 1969, all three counsellors on the program staff were earning a salary of $625 per month despite the fact that the plaintiff had as much as sixteen months' seniority over her co-workers. Furthermore, all three counsellors had reached that level by the end of their first year with the program.

No other raises were given to any staff counsellors until June of 1970, approximately six weeks after the plaintiff's resignation.

The plaintiff contends that at various times, after December of 1968, she asked the Program Director to raise her salary, but that her requests were turned down because, according to the Program Director, there were no funds available in the program's budget for employee raises. She also contends, that she was told on those occasions that her request would be presented to the proper authorities. (T. 49:6). It has, however, been established that no effort was ever made to have the program budget amended in order to raise the plaintiff's individual salary; although at least one unsuccessful effort was made to have all staff salaries raised by 5%. (Exhibits 34–35), and there is testimony to indicate that there was an effort made to have the salary *scale* for plaintiff's job category revised. (T. 161:7).

The plaintiff contends that she was denied the above-mentioned employment benefits because of the discriminatory manner in which the defendants conducted their offices.

gon's authority was informal in nature, that his position carried with it no formal title,

and that he was apparently paid on substantially the same scale as the plaintiff.

## JURISDICTION

■■ As noted above, the plaintiff has brought this action under Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d et seq. (1974), dealing with discrimination in programs receiving federal financial assistance. However, since this action arises out of an employment relationship, Title VII of that Act, 42 U.S.C.A. § 2000e et seq. (1974), has a superficial relevancy to this action.[6] It is however, clear that this action could not arise under Title VII. When this action arose, during the years 1967 through 1970, Title VII expressly excluded from its terms states and political subdivisions of states.[7] Consequently, the Court is faced with the initial question of whether or not it has subject-matter jurisdiction over an action seeking monetary damages for alleged employment discrimination under Title VI. This Court is not aware of any other suit arising under Title VI which has sought the recovery of monetary damages from the persons, organizations, or agencies administering federal financial assistance.[8] However, it has been held that 42 U.S.C.A. § 2000d is merely a codification of the requirements of the equal protection clause of the fourteenth amendment of the United States Constitution and that essentially the same showing is required to establish a violation of Title VI as is required to establish a violation of the fourteenth amendment. Goodwin v. Wyman, 330 F.Supp. 1038, n. 3 (S.D.N.Y.1971), aff'd (without opinion) 406 U.S. 964, 92 S.Ct. 2420, 32 L.Ed.2d 664 (1972). Of course,

a citizen who has been denied the equal protection of the law by agents of the state can maintain an action for damages under 42 U.S.C.A. § 1981 et seq. (1974). Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Consequently, the Court finds that it has subject-matter jurisdiction over this action.

■ However, since the plaintiff is seeking only monetary damages, this Court has no jurisdiction over the City of Omaha. As an instrumentality of the state, the City is cloaked in sovereign immunity. U.S.Const. Amend. XI; Edelman v. Jordan, 415 U.S. 651, 94 S. Ct. 1347, 39 L.Ed.2d 662 (1974), and nothing in the language of 42 U.S.C.A. § 2000d suggests that the City has waived that immunity in this case.

## HAS PLAINTIFF BEEN DENIED THE EQUAL PROTECTION OF THE LAW?

*Promotion*

The plaintiff contends that under the rule of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L. Ed.2d 668 (1973), she has established a case of racial or sexual discrimination in light of the defendants' failure to promote her to the position of Chief Counsellor. The *McDonnell* case, of course, arose under Title VII of the Civil Rights Act. While the Court is not entirely certain that the rules developed to enforce that statute against a private employer are fully applicable in a Title VI

6. The Civil Rights Act of 1964, Title VII, § 703, 42 U.S.C.A. § 2000e-2 provides in part: "(a) It shall be an unlawful employment practice for an employer—
   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . . "

7. Civil Rights Act of 1964, Pub.L. 88-352, Title VII, § 701, 78 Stat. 253, provided: "(b) The term 'employer' . . . does not include . . . a State or political subdivision thereof . . . . . "

In 1972 the above statute was amended—state and political subdivisions thereof are now within the definition of the term "employer". 42 U.S.C.A. § 2000e(b).

8. Several cases have, however, found that private individuals may maintain a cause of action under Title VI to require those administering federal financial assistance to comply with federal civil rights statutes and regulations. *See e. g.*, Serna v. Portales Municipal Schools, 499 F.2d 1147 (10th Cir. 1974).

suit against a government instrumentality,[9] it nevertheless will accept plaintiff's representations on that point for the present, since it is convinced that even under the *McDonnell* rule the plaintiff would not be entitled to recovery in this case.

In *McDonnell* the Court held that under Title VII, a prima facie case was established when the plaintiff demonstrated:

"(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

411 U.S. at 802, 93 S.Ct. at 1824.

93 S.Ct. at 1824.

■ Once the above showing is made the burden of going forward with evidence shifts to the defendants to articulate a non-discriminatory reason for the plaintiff's rejection. *Id.* If the defendant is successful in stating such a reason, the burden again shifts to the plaintiff to show that the explanation proffered by the defendant has no substantive validity or is merely a device for permitting the defendant to continue past or present discriminatory practices. *Id.* 411 U.S. at 804, 93 S.Ct. at 1817; Rogers v. International Paper Company, 510 F.2d 1340 (8 Cir., filed January 7th, 1975).

■ The premise of the McDonnell case is, of course, that under the Civil Rights Act of 1964 an employer cannot deny employment benefits on the basis of race, religion, gender, or national origin. In the present case, the plaintiff contends that she was entitled to promotion to the position of Department Director or Chief Counsellor. She seems to base this contention on the fact that she was the senior counsellor on the program's staff, and that when Mr. Colgon resigned a supervisory position was vacant. Since she applied and was qualified to assume Mr. Colgon's duties, but was refused assignment to such duties, she contends that her prima facie case is established. The plaintiff's contention might be correct if Mr. Colgon, or his replacement, Mr. Cuevas, had been, in fact or form, the Chief Counsellor of the program. The evidence, however has established that they were not.

· Neither Mr. Colgon nor Mr. Cuevas were ever officially promoted to the position of Chief Counsellor.[10] The contract between the City and G.O.C.A. clearly specifies the procedures to be followed in filling that position and those

9. The Court is specifically concerned that the *McDonnell* rule might not account for the common law immunity of executive agents of the government. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Under the *McDonnell* rule, once the plaintiff has established a "prima facie" case, it is incumbent upon the defendant to justify his conduct. Under the *Pierson* rule the burden is upon the plaintiff to overcome the defendant's qualified common law immunity by demonstrating an absence of good faith or probable cause. In the present case, it will be noted that the plaintiff is seeking damages far in excess of back pay which she may be granted within the equitable jurisdiction of the Court without a showing of bad faith.

10. The contract between the City and GOCA (Exhibit 15, § 9) state in pertinent part that "(t)he (City) will select qualified personnel to fill the positions of the Program Director and the *Chief Counsellor*. . . . " (Emphasis added). It has, however, been fairly well established that the Chief Counsellor's position was not filled at least until sometime after the spring or summer of 1970. The position was apparently left vacant because it was felt that the program's size did not require the services of a Chief Counsellor. Though there may be some controversy on this latter point (Exhibit 30, at 13) it is obvious that federal authorities were aware that the position was not filled, since they were to participate in the hiring decision, (Exhibit 15, § 9) and it does not appear that they were distressed over that situation. Though, on occasion, the Courts have upheld third-party rights arising from government contractual agreements, *see* Serna v. Portales Municipal Schools, *supra* at n. 8; Blackshear Residents Organization v. Housing Authority, 347 F.Supp. 1138 (W.D.Tex.1972), the plaintiff in this case is not among the class

procedures were not followed in either Mr. Colgon's or Mr. Cuevas' case.[11]

More importantly, neither of these gentlemen exercised any authority which was recognized by officials of G.O.C.A. or the federal government, nor does the evidence suggest that either earned additional financial or other tangible benefit from their assigned duties.[12] Ammons v. Zia Company, 448 F.2d 117 (10th Cir. 1971). In the *Ammons* case it was held that a plaintiff who had been denied a clearance to a certain company test site had not established a prima facie case of sex discrimination because she had failed to demonstrate "that a test area clearance would have entitled her to higher pay." *Id.* at 119. The present case is very similar. The plaintiff has demonstrated that her request to be assigned to Mr. Colgon's former duties was denied. She has not, however, demonstrated that she was denied a benefit of her employment.

The Court, of course, recognizes that both of the gentlemen possessed some supervisory authority and that, as a consequence, they gained professional experience and the prestige associated with supervisory responsibilities. However, the plaintiff was permitted to share in these less tangible benefits through her assignments to the Offutt summer program. It is to be noted that on those occasions she derived authority from the same source and of a similar nature, and

that there is no evidence to suggest that the attributes of Mr. Colgon's former assignment were different in either kind or degree from the plaintiff's assignment.[13] It is not known whether other counsellors also participated in the administration and supervision of the program. However, in light of above, it is clear that a full two-thirds ($\frac{2}{3}$) of the counselling staff did participate and it would, therefore, seem that administrative and supervisory assignments were rather broadly distributed among the counsellors in order to facilitate or improve the functioning of the program. The authority distributed through these assignments was, in every case, informal or derivative in nature, and did not entitle the possessor to enhanced employment benefits. The Court is in full agreement with the *Ammons* case, that the Civil Rights Act of 1964 was never intended to require businessmen or government administrators to delegate each work assignment as though it were a promotion or other type of employment benefit regardless of whether or not the assignment would in a real and substantial sense improve the plaintiff's employment situation.

SALARY

■ The plaintiff also contends that she has been denied salary increases by the defendants solely on account of her race and sex. While a government employee has no constitutional right to a

---

of persons that Congress intended to benefit through the enactment of the Economic Opportunity Act of 1964, Pub.L. No. 88–452, Title I, § 111, 78 Stat. 512, nor is she otherwise a third-party beneficiary of the City's contract. Consequently, she has no standing to seek enforcement of the City's contract with GOCA. United States v. Lovknit Mfg. Co., 189 F.2d 454, 456–457 (5th Cir. 1951); *See generally* Martinez v. Phillips Petroleum Company, 283 F.Supp. 514, 519 (D.Idaho 1968). Whatever rights she may have in this action arise solely from federal civil rights statutes and the fourteenth amendment.

11. The contract between the City and GOCA (Exhibit 15, § 9) requires that the name of the City's nominee for "Chief Counsellor" be submitted in writing to GOCA. If GOCA did not respond in three days, or responded

favorably the appointment would then take effect.

12. The employment records of Mr. Colgon were not offered at trial. Consequently, nothing is known about his salary level. It is, however, known that when Mr. Cuevas assumed Mr. Colgon's former duties, he continued to be paid on substantially the same basis. His salary remained lower than plaintiffs until several months later. (Exhibit).

13. In this regard, it is to be noted that assignment to the Offutt summer program was not "bad duty" or demeaning, or in any sense a less desirable work assignment. (Exhibit 26). Indeed, except for the position of Program Director it may have been the most responsible position existing within the program.

salary increase not provided for by statute or regulation, but given discretionarily by executive officials, Morris v. Williams, 149 F.2d 703 (8th Cir. 1945); Morey v. Independent School District, 312 F.Supp. 1257 (D.Minn.1969) affirmed 429 F.2d 428 (8th Cir. 1970), it is nevertheless, a violation of his civil rights for the executive to exercise its discretion in an arbitrary or invidiously discriminatory manner. See Frazier v. Curators of University of Missouri, 495 F.2d 1149 (8th Cir. 1974); see generally Strickland v. Inlow, 485 F.2d 186 (8th Cir. 1973), cert. granted 416 U.S. 935, 94 S.Ct. 1932, 40 L.Ed.2d 285 (1974).

It has been established that during the time the plaintiff was on the NYC staff, she received only one raise from $600 to $625 per month, or slightly over 4% of her base salary, while, during comparable periods of time, two male counsellors received raises from $550 to $625 per month, or slightly less than 14% of their base salaries. It is her contention that the other staff counsellors received proportionately greater raises in salary because the defendants granted raises in an invidiously discriminatory manner. Obviously, she is not contending that she was paid less than any other program counsellor. Nor does she contend that she has been denied benefits of any statute, ordinance, or regulation. Her sole contention is that in light of her background education and job performance she was entitled to a higher salary, and that she requested a higher salary and was turned down while others on the program's staff continued to receive raises. She contends that this disparity in treatment in light of her superior qualifications establishes a prima facie case of racial or sexual discrimination.

The defendants, on the other hand, contend that when the NYC program began a maximum salary for the plaintiff's occupation was established by agreement between the Mayor and officials of G.O.C.A. which was $625 per month during the years that the plaintiff was with the program. Consequently, since the plaintiff's starting salary was higher than that of her co-workers, the defendants contend that it was not possible to raise the plaintiff's salary in the same proportion as her co-workers' salaries and still maintain their salary scale.

If the plaintiff was, in fact, earning the established maximum salary for her occupation, and the maximum was otherwise neutral and non-discriminatory in effect, then the defendants have not been guilty of discrimination. See generally Ammons v. Zia Company, supra. The evidence relating to the existence of an established maximum salary is confusing and conflicting.

The written contract between the City and G.O.C.A. contains no mention of staff salaries. See (Exhibits 15; 29; 29A). Nevertheless several witnesses, presented by both the plaintiff and defendants, have acknowledged that there was an established policy for staff salaries that included, at least, a minimum salary level for plaintiff's occupation. See (T.159:3; 197:18; Exhibit 30, at 22–23, 47–48). The plaintiff contends, however, that no maximum salary level was ever established. To support this proposition she has offered the testimony of Mr. Skaggs who was the Assistant Coordinator for Manpower Activities for G.O.C.A. during the years 1968 and 1969 and Exhibit 29A which are certain budgetary records from the local program.

The record from Exhibit 29A which the plaintiff primarily relies upon is reproduced in the margin.[14] It shows, in-

14.

| SUMMARY————STAFF COSTS | | | | |
|---|---|---|---|---|
| N. Y. C. Position Title | Salary Per Month | % of time to Project | No. Weeks or No. Hours | Total Amount |
| . . . . Counseling . . . . | 660 | 25 | 29 | 1,155 |

*ter alia,* that a salary of $660 per month was at one time provided for "Counselling" by the federal authorities who drafted the program's budget. Plaintiff contends that this document establishes a permissible salary level for her occupation which is higher than the alleged maximum salary suggested by the defendants.

The Court has not been instructed as to the proper interpretation of this document, and it assumes no expertise in that regard. Nevertheless, the Court must examine the document as a whole, and, when doing so, it is difficult to overlook certain features of this document which bear upon the relevancy and competency of the figure referred to by the plaintiff. The $660 figure bears no obvious relationship to any other figure in the program's budget. That is, the computations for "Staff Costs" contained in the document, have no obvious relationship to the funds allocated for administrative and supervisory salaries by the program's budget. Furthermore, the $660 figure bears no obvious relationship to reality, since it has not been shown that any staff counsellor received a salary higher than $625 per month during the years relevant to this case. Finally, and perhaps most importantly, the document itself suggests that the $660 figure may be merely part of an accounting formula used to appropriate funds for staff salaries. In this regard, it is interesting to note that the so-called "Total Amount" allocated for counselling equals only 25% of a monthly salary of $660. In light of the above, this document has been very difficult to interpret and has accordingly received little weight.

The plaintiff has also offered the testimony of Mr. Skaggs who, as G.O.C.A.'s Assistant Coordinator for Manpower Activities, was, in part, responsible for drafting the local programs budget. He testified, by way of deposition (Exhibit 30, at 22) that there was an established salary range for NYC counsellors, but that he did not know what that range was or whether the plaintiff was earning the maximum during 1968 and 1969. He also testified that the salary range was not changed during 1968 and 1969, and that it had been established by agreement between the City, G.O.C.A. and the federal government. However, he also testified as follows:

"Q. . . . You are aware of the fact that there was an agreement in effect between the City and NYC that established certain parameters 'for a (sic) pay of NYC counsellors; is that correct, sir?

A. I'm not sure I understand that.

Q. Well, that there was a minimum pay and a maximum pay according to an existing agreement between the City and G.O.C.A. relating to the salary range of NYC counsellors; they can be paid no less that "X" amount, nor more than "X" amount?

A. I believe there was a minimum set, but I don't believe as an agreement with the budget that there is limitation. But as an agreement, I don't believe there was a maximum.

Q. You mean to raise somebody's salary then, you wouldn't have to modify the agreement?

A. You would have to modify the agreement, but there was no agreement per se between the City and G. O.C.A. or the Federal Government that stated that there was a maximum or (sic) any position."

(Exhibit 30, at 47 et seq.).

There are inconsistencies in this testimony which are not easily reconciled. They seem to suggest that the witness may have been less than certain of the facts. Though he was, perhaps, in a position to know of such matters, it would not be that surprising if he did not. He was not, for example, privy to the agreement setting staff salaries. Indeed, he was not even employed by G. O.C.A. when the agreement was originally reached or subsequently amended. More importantly, the relationship of the contracting parties was such that there would be little incentive for a person in the witness' position to be vigi-

lant of the program's employment policies. All changes in employee compensation were initiated by the City. However, since all staff salaries were paid from federal funds, no raise could take effect until it was approved by federal authorities and the program's budget amended. The establishment of a maximum salary level, then, would be of little concern to federal authorities who would, in any event, retain final control over staff salaries through their control of the program's budget.

On the other hand, the maintenance of a salary scale which conformed to the salaries paid in other municipal departments would be of continuous concern to the City. *See* (Exhibits 34; 35). If NYC salaries were not consistent with the salaries paid in other departments the result could be inequitable and potentially disruptive.

In light of the above, it would seem that federal authorities would take a very different view of the program's salary scale, than would the City. To federal authorities it would be merely a guideline amenable to any one of a number of contingent events, including perhaps notions of seniority, or satisfactory job performance. To the City, however, the salary scale would be an unalterable statement of basic policy.

Though the plaintiff's witness might disagree, the Court is compelled to accept the unequivocal testimony of the defendant, Program Director, that the plaintiff was earning the maximum permissible salary for her occupation. The Court is not unmindful that the Program Director has an interest in the outcome of this case. However, his testimony is supported by the testimony of another knowledgeable witness (T. 198:7), has remained consistent over four (4) years of controversy (Exhibit 1, 107:25), and is consistent with the City's salary policy in other municipal departments. *See* Municipal Code Omaha, 7:08.050, et seq.[15]

15. Even if the Court had not been able to make the above finding the plaintiff still would not have proven her case to this point. In the absence of ordinance, statute, regulation, or contractual agreement the decision to raise an employee's salary is largely within the discretion of the administrating officer. Morris v. Williams, *supra*; Morey v. Independent School District, *supra*. As such, it is within the administrator's discretion to refuse to raise an employee's salary for any reason, or for no reason at all so long as the administrator is not guilty of treating similarly situated and occupied employees differently on a basis which is unrelated to their job performance. Buhr v. Buffalo Public School Dist., 509 F.2d 1196, at 1202 (8th Cir., filed December 31st, 1974). In the present case, the plaintiff and all of her co-workers were hired to perform the same tasks. The plaintiff, however, was hired at a substantially higher wage than her co-workers. She has contended that the defendants had a duty to maintain that favorable pay differential, and that their failure to do so constitutes a prima facie case of invidious discrimination. The Court cannot accept this logic. In the absence of some mandatory requirement, it is not incumbent upon an employer to maintain a pay differential among similarly situated and occupied employees simply because the various employees were hired at different rates of pay, or at different times.

Where neither law, nor contract enjoins a particular wage upon the parties, the value of a person's skill and loyalty is determinable only in the market place, and the Court has no authority to assume control over the parties' discretion in such matters. Accordingly, since the plaintiff has never earned a wage lower than her co-workers, the Court could not infer that the defendants' discretionary refusal to raise plaintiff's salary in the same proportion to her co-workers was invidiously discriminatory. In order to establish such a case, the plaintiff would have to present other direct or circumstantial evidence suggesting that the defendants were motivated by racial or sexual animus.

The Court does not feel that in requiring that this showing be made it is departing from the principle stated in Rogers v. International Paper Company, 510 F.2d 1340 (8th Cir., filed January 7th, 1975) ; United States v. City of Black Jack, 508 F.2d 1179 (8th Cir., filed December 27th, 1974) ; Williams v. Matthews Co., 499 F.2d 819 (8th Cir. 1974), wherein it has been held that "the plaintiff (in an action brought under the Civil Rights Act of 1964) need make no showing whatsoever that the (defendant's) action . . . was racially motivated." United States v. City of Black Jack, *supra*, 508 F.2d at 1185. The premise of those cases is that racial animus need not be shown where the defendant's action has an actual or predictable discrimina-

The plaintiff contends that even if there was an established maximum salary level for her occupation, that, nevertheless, it was arbitrary and discriminatory for the defendants to deny her raise since federal authorities had on prior and subsequent occasions expressed their willingness to raise her salary above the $625 level. (Exhibit 30 at 5–10). Consequently, she contends that the defendants are using the program's salary policy as a pretext to disguise discriminatory conduct.

In an effort to prove this contention the plaintiff has attempted to show that she was a competent and dedicated worker, that funds were available from federal sources to raise her salary and that the defendants' refusal to grant her a raise was racially or sexually motivated.

The defendants have not seriously challenged the plaintiff's competency or dedication. However, it should be reiterated that the plaintiff's duties were not substantially different from the duties of her co-workers.[16] Furthermore, there is evidence which suggests that in the absence of an established maximum salary, there may have been funds available to provide plaintiff with a raise.[17] (Exhibit 30 pp. 8–9). However, there is little credible evidence to indicate that the defendants have conducted themselves in a racially or sexually discriminatory manner.

In an effort to establish an invidiously discriminatory pattern of conduct on the part of the defendant, Program Director, the plaintiff has shown that although the participants in the local NYC program were predominately black females, that she was the only permanent counsellor who was black, and, for a good deal of the relevant time, the only one which was female.[18] The plaintiff testified that of an enrollment of approximately 175 when she was hired,

---

tory effect. In the present case such an effect is not at all clear. It is true that if one compares the proportionate rate of salary increases among the plaintiff and her peers, that the plaintiff's salary was not raised in the same ratio as other counsellor's salaries. However, in absolute terms the plaintiff has not only not earned less than her peers, but for a substantial period of time actually earned more than them. The defendants were under no lawful duty to maintain a pay differential favorable to the plaintiff. Consequently, their failure to do so in this case, cannot be said to have an actual or predictable discriminatory effect unless the Court is given some basis upon which to believe that a non-black or male in plaintiff's position would have received proportionately greater raises.

16. Her regular duties were of course, substantially similar to those of the other staff counsellors. Her assignment to the Offutt summer program of course, increased her responsibilities. However, as previously noted, *infra*, it would seem that responsibilities of this type were rather broadly distributed among the counselling staff.

17. The evidence on this point is found in the deposition of Mr. Skaggs who testified that *funds, already in the program's budget, could* have been shifted between accounts to provide raises to deserving employees. He said that he felt that the plaintiff was a deserving employee and that her salary should have been raised. Finally, he testified that GOCA officials met with the Program Director and the counselling staff to dispel the rumor that raises were being denied because of a lack of federal funds, and to suggest to the Program Director that he request raises in employee salaries. These meetings allegedly took place in the latter part of 1969 or early 1970. During the fall of 1969 the following exchange of letters occurred:

On September 24, the Program Director inquired with GOCA's Coordinator of the Neighborhood Youth Corp. as to whether or not a 5% raise granted to the employees in other municipal departments could be given to NYC staff personnel. (Exhibit 34). This inquiry was apparently forwarded to the "Area Supervisor" in Kansas City. On October 29, the Program Director received a response (T. 174:17) expressing the concern that raises in employee salaries would overextend the program budget and harm its performance. (Exhibit 35).

There is, consequently, some doubt as to the availability of federal funds. However, the Court need not rest its decision on this point.

18. There is no indication in the evidence as to the race and sex of the temporary counsellors hired for the summer months.

approximately 55% were black and 60% were female. By 1969 the number of enrollees had increased and they were approximately 70% black, and 75% female. The remainder of the enrollees included both Mexican-Americans and American Indians.

While it is possible to establish racial or sexual discrimination on the basis of statistical evidence, Reed v. Arlington Hotel Co., 476 F.2d 721 (8th Cir. 1973), cert. denied 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973), any inference of racial or sexual motivation arising from the statistics offered by the plaintiff would be extremely tenuous. During the relevant years there were apparently only three counsellors on the NYC staff. When the plaintiff joined the program the other two counsellors were Caucasian. Over the period of the next two and one-half years three counselling vacancies occurred and each was filled by a person from a minority group found in the community and among the program's participants.[19] Since there were only three counselling positions on the program's staff, it is clear that greater racial proportionality could only have been achieved by excluding another racial minority from representation on the counselling staff. Even a person wholly sympathetic with minority problems might consider total exclusion of a minorities representation on the staff, too high a price to pay for greater proportionality. Consequently, it is difficult for the Court to infer racial prejudice from these statistics.

When the plaintiff joined the counselling staff it was two-thirds (⅔) female. By the summer of 1969 that proportion had dropped to one-third (⅓). If the statistical base were larger, this might suggest a rather dramatic change in hiring policy. However, this substantial statistical change was caused by only two hiring decisions. This Court can infer no racial or sexual connotations based upon such a meager employment history.[20]

The plaintiff has also contended that she was harassed, abused and humiliated by the Program Director and that such treatment was racially or sexually motivated.[21] The evidence in this case has established that the Program Director was a tough administrator and that at one time or another all or most of his employees were subjected to discipline. The plaintiff's evidence does not establish that blacks or females were treated substantially different from non-black males.[22]

19. The racial background of the three counsellors hired after December of 1967 (including the plaintiff's replacement) are Mexican-American, American-Indian, and Negro.

20. It should be pointed out that the plaintiff's statistics have a limited usefulness in the present case. Even if they were very favorable to the plaintiff they would not by themselves establish that the plaintiff has been the victim of race or sex discrimination. She is not contending in this case that she was denied employment. Consequently, statistics on the defendants' hiring practices are useful only to the extent that they aid in establishing a pattern of discriminatory conduct which, if proven, would permit the Court to infer that the defendants' decision not to raise the plaintiff's salary was arbitrary and discriminatory.

21. Specifically, the plaintiff contends that on one occasion the Program Director checked the mileage she was reporting on her expense account; that he subjected her to discipline without good reason, or in the presence of the program's staff; and that when he introduced her to federal authorities he referred to her as the program's "black counsellor."

22. There has been a great deal of contradictory evidence as to whether or not blacks were subjected to more abusive treatment from the Program Director. Most of this evidence is little more than the conclusions of the various witnesses who testified before the Court and before the Nebraska Equal Opportunity Commission on a related matter, supported by little or no foundation or clarification. To compound this none of the witnesses are of unimpeachable credibility. Consequently, this evidence has been of little help to the Court. The burden of proof was, of course, on the plaintiff, and the Court cannot say that she has proven this point by a preponderance of credible evidence.

One of the plaintiff's witnesses who was herself Caucasian testified that the Program Director told, or implied to her on one occasion that she should not associate with black persons. She also testified that when she continued her association with black individuals she was harassed, annoyed, and finally discharged by the Program Director. The defendant, Program Director, denied that his statement had any racial connotation, expressed or implied, and that the witness' discharge was caused by her tardiness, and her socializing during business hours.

This witness has previously established a claim of discrimination before the Nebraska Equal Opportunity Commission, based upon her discharge, largely upon the testimony she offered before this Court. The Court has examined the transcript of those proceedings and has found that the bulk of the substantive evidence is unfounded opinion evidence and hearsay which would be inadmissible in judicial proceedings. Furthermore, there are serious discrepancies between this witness' testimony before the N.E.O.C. and this Court which bear upon the credibility of this witness' story. At trial this witness testified that the Program Director told her:

"A. . . . not to associate with people who might influence me. I think at that time, he meant Mrs. Gilliam and Miss Pelham who was the Office Manager, then.

Q. For the record, can you tell us if Miss Pelham and Mrs. Gilliam—what was their race?

A. They were both black."

(T.82:14).

On cross-examination the witness said she could not remember if the defendant referred to either black people or to the plaintiff and Miss Pelham during this conversation. (T.87:20).

In response to a question asked her before the Nebraska Equal Opportunity Commission this same witness described the above conversation as follows:

"A. The occasion was when I had to go to City Hall on several occasions to deliver things and so forth, and when I was over there, Mr. Bonainto, who spends a lot of time at City Hall, saw me talking to several black people, and first he called me into his office, along with Mrs. Gilliam and threatened me with termination to stay away from everyone who works for GOCA, stay away from everyone that worked for the City to keep myself in the office, to keep my opinions in the office, and don't associate.

. . . . . .

Q. When he asked you to stay away from the people at GOCA and the people at City Hall, was this in relationship to any race, or was this a blanket statement to stay away without any regard to race or religion? Did he qualify that, or did he just say stay away from people?

A. Well, he said that black people were trouble makers. He didn't want his program to endure trouble makers and so forth. He did not say 'You do not associate with the blacks.' He told me that blacks were trouble makers.

Q. At this same confrontation?

A. Yes."

(Exhibit 1, 6:15).

There are certain discrepancies in the above two statements which bear heavily upon this witness' ability to fairly relate what she was told on this occasion. Before the N.E.O.C. it was the City's position that the witness had been discharged partly because she spent too much time socializing with other NYC employees. Consequently, before the Commission her story was that the Program Director's statement related to her association with blacks outside of the NYC office.

In the present case the issue is whether or not the plaintiff has suffered discriminatory treatment. Consequently, the witness testified that the Program Director's statement related to the wit-

ness' association with the plaintiff and other black staff members. This discrepancy suggests that the theme, if not the substance of this witness' testimony can be influenced by the result it is intended to achieve. There is little doubt that some statement was made by the Program Director. However, there is no way to tell whether the substance of that statement related to black people in general, or in particular, or whether it merely related to a non-racial desire on the part of the Program Director that the witness not socialize during office hours.

Finally, the plaintiff has shown that on at least one occasion the Program Director made an angry and profane remark about the plaintiff, out of her presence, which reflected upon her race. The defendant denies making the remark, however, there is a substantial likelihood that the remark was made. Such a remark, while unfortunate, objectionable and offensive, does not, in and of itself, prove that the defendants conducted their offices in an invidiously discriminatory manner.

In light of the above, it cannot be said that the defendants are attempting to use the program's established salary scale as a pretext to conceal discrimination. While it is clear from the testimony of several witnesses that the environment of the NYC program was less than amicable, it has not been shown that the plaintiff's salary was restrained because of her race or gender. No employee earned a salary higher than the plaintiff during the relevant period of time and there is little to suggest that a non-black male in plaintiff's position would have received the raises which were denied to her. Whether the program's salary scale was established by formal agreement between the City and G.O.C.A., or merely by the City with the approval of G.O.C.A., it appears to have been neutral and non-discriminatory when it was set and consistently applied to all staff counsellors thereafter. It did not become invidiously discriminatory merely because the plaintiff was the first among her peers to be restrained by it.

Accordingly, judgment will be entered for the defendants.

### ORDER

Pursuant to the Court's Memorandum opinion filed January 24th, 1975,

It is ordered that the plaintiff's Complaint be dismissed with prejudice.