**Lewis "Toby" TYLER, Plaintiff–Appellant,**

v.

**CITY OF MANHATTAN, Defendant–Appellee,**

**United States of America, Amicus Curiae.**

No. 94–3344.

United States Court of Appeals,
Tenth Circuit.

July 8, 1997.

---

L.J. Leatherman of Palmer & Lowry, Topeka, KS, for Plaintiff–Appellant.

Steve Fabert (William L. Frost, Manhattan, KS, and David P. Madden and Kurt A. Level of Fisher, Patterson, Sayler & Smith, L.L.P., Overland Park, KS, on the brief) for Defendant–Appellee, City of Manhattan.

Gregory B. Friel (Jessica Dunsay Silver with him on the brief), Department of Justice, Washington, DC, for Amicus Curiae United States of America.

Before BRISCOE and MURPHY, Circuit Judges, and JENKINS, Senior District Judge.*

MURPHY, Circuit Judge.

The plaintiff, Lewis "Toby" Tyler, appeals a district court order striking his claim for compensatory damages under Title II of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12133. The district court ruled that compensatory damages for mental and emotional injury were not available under the ADA absent intentional discrimination. The district court further concluded that Tyler had not claimed he was subjected to intentional discrimination. Tyler appeals, arguing that he did indeed assert a claim of intentional discrimination. This court has jurisdiction to review Tyler's

---

* The Honorable Bruce S. Jenkins, Senior United States District Judge for the District of Utah, sitting by designation.

claim under 28 U.S.C. § 1291.[1] Because we find that the district court did not abuse its discretion in determining that the pretrial order does not include a claim of intentional discrimination, **we affirm.** No cause exists for this court to resolve an issue raised not by Tyler but by the United States as amicus: whether compensatory damages are recoverable for unintentional violations of the ADA.

Tyler, a resident of Manhattan, Kansas, is disabled within the meaning of the ADA.[2] He is partially paralyzed and essentially unable to read. Tyler has taken it upon himself to see that the City of Manhattan complies with the ADA. He complained to the City about the lack of handicapped-accessible parking at City facilities; about the lack of wheelchair access to public restrooms, parks, tennis courts, the zoo and other public facilities; about the City's failure to make agendas and information packets for public meetings available on audio tape; about the City's failure to conduct an adequate self-evaluation as required by the ADA; and about the City's licensing of inaccessible liquor stores.

Dissatisfied with the City's response to his complaints, Tyler brought this action against the City, alleging in four separate claims that the City had violated Title II of the ADA by (1) failing to meet the minimum requirements for a self-evaluation plan under the ADA; (2) excluding persons with disabilities from participation in and the benefit of City services and programs; (3) "directly utiliz[ing] methods of administration" and "subject[ing] Plaintiff to discrimination on the basis of his disability";[3] and (4) licensing and contracting with businesses that are in violation of the ADA. The complaint prayed for relief consistent with the enforcement provisions of the ADA.

The district court granted the City summary judgment on the last count of Tyler's complaint and generally denied the City's motion for summary judgment on the remaining counts. *See Tyler v. City of Manhattan,* 849 F.Supp. 1429 (D.Kan.1994).[4] Two days later, on April 20, 1994, the district court *sua sponte* struck from the pretrial order Tyler's compensatory damage claim for mental anguish, humiliation, embarrassment and "denial of his right of participation." *See Tyler v. City of Manhattan,* 849 F.Supp. 1442, 1445 (D.Kan.1994).[5] The court concluded that compensatory damages for emotional distress were not available under the ADA absent intentional discrimination and that Tyler had not alleged intentional discrimination either in his complaint or in the

---

1. The City suggests that the district court's judgment was not a final, appealable judgment because it ordered only injunctive relief and the district court necessarily retains jurisdiction over the parties until they have complied with the terms of the injunction. The fact that the district court may retain jurisdiction over the parties to enforce its judgment does not convert the judgment to an interlocutory order for purposes of appeal. *See, e.g., United States v. Local 30, United Slate, Tile & Composition Roofers,* 871 F.2d 401, 403 (3d Cir.), *cert. denied,* 493 U.S. 953, 110 S.Ct. 363, 107 L.Ed.2d 350 (1989). An order or judgment is final for purposes of appeal if it resolves all substantive issues on the merits and effectively ends the litigation. *See, e.g., Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633–34, 89 L.Ed. 911 (1945); *Turnbull v. Wilcken,* 893 F.2d 256, 257 (10th Cir.1990). The judgment in this case, ordering injunctive relief, resolved all remaining issues on the merits and effectively ended the litigation. The fact that the original judgment left open the issue of costs and attorney fees did not deprive the judgment of finality for purposes of appeal. *See Budinich v. Becton Dickinson & Co.,* 486 U.S. 196, 202, 108 S.Ct. 1717, 1721–22, 100 L.Ed.2d 178 (1988). There was thus a final, appealable order, and Tyler was free to appeal from anything in that judgment or the court's prior orders that "dissatisfied him." *See Hameetman v. City of Chicago,* 776 F.2d 636, 641 (7th Cir.1985).

2. The ADA defines "disability" to include "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A).

3. This third claim was dropped in the pretrial order, and the fourth claim was renumbered Count III.

4. The court granted the City partial summary judgment on Count II to the extent Tyler claimed that the City had barred him from participating in preparation of the City's self-evaluation and transition plan under the ADA. *Tyler v. City of Manhattan,* 849 F.Supp. 1429, 1440 (D.Kan. 1994).

5. The court construed Tyler's damage claim for denial of his right of participation "as one for emotional distress as a result of being denied the opportunity to participate in City programs, services, and activities." *Tyler,* 849 F.Supp. at 1443 n. 3.

pretrial order. *Id.* at 1444 & n. 5. The court further ordered that Tyler's discrimination claim be tried to the court, not to a jury. *Id.* at 1445.

After Tyler's remaining claims had been resolved by bench trial,[6] Tyler filed the instant appeal claiming that the district court had erred in striking his claim for compensatory damages. For his part, Tyler does not contest the district court's ruling that intentional damages must be pleaded and proved in order to recover compensatory damages for mental and emotional distress under the ADA. Instead, Tyler asserts the district court misinterpreted its pretrial order in determining that it did not contain a claim of intentional discrimination. Accordingly, the only issue on appeal is whether the pretrial order contains a claim of intentional discrimination.

■ Rule 16(e) of the Federal Rules of Civil Procedure provides as follows:

> After any conference held pursuant to this rule, an order shall be entered reciting the action taken. This order shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice.

An order entered pursuant to Rule 16(e) supersedes the pleadings and controls the subsequent course of litigation. *Hullman v. Board of Trustees*, 950 F.2d 665, 668 (10th Cir.1991). As this court noted in *Hullman*,

"the pretrial order 'measures the dimensions of the lawsuit, both in the trial court and on appeal.'" *Id.* (citations omitted). Because the district court is in the best position to interpret its pretrial order, our standard of review on appeal is abuse of discretion. *See Perry v. Winspur*, 782 F.2d 893, 894 (10th Cir.1986).

■ We have reviewed the pretrial order and agree with the district court that the order does not describe acts of intentional wrongdoing. Instead, it is apparent that the order describes acts and omissions which have a disparate impact on disabled persons in general but not specific acts of intentional discrimination against Tyler in particular. Furthermore, there are no allegations in the pretrial order that the City was motivated by animus toward the disabled generally or Tyler specifically.

■ Despite the fact that Tyler did not raise the issue, *amicus curiae*, the United States, argues that Tyler is entitled to seek compensatory damages for violations of Title II of the ADA without alleging intentional discrimination. We choose not to address this argument because it was not raised by a party to this appeal. It is instead an attempt by *amicus* to frame the issues on appeal, a prerogative more appropriately restricted to the litigants. *See DiBiase v. SmithKline Beecham Corp.*, 48 F.3d 719, 731 (3d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995); *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 705 n. 22 (1st Cir.), *cert. denied*, 513 U.S. 919, 115

---

6. On the first count of the complaint, the district court found that the City's self-evaluation and transition plans did not comply fully with federal regulations. On the plaintiff's second claim, the district court found that the City had discriminated against Tyler based on his disability by not providing a means for him to attend a City Commission meeting when the elevator at the City hall was out of order; by retaining physical barriers at City parks which impede wheelchair access and thus exclude him from participation in certain recreational activities; and by effectively denying him access to the restroom facilities at the City's municipal court building. The court rejected Tyler's other specific claims of discrimination. The court ordered the City to adopt a schedule for installing curb ramps and to complete a self-evaluation of its current services, policies and practices consistent with federal regulations. The court also ordered the City to

relocate any City-sponsored ball games to an accessible field and not to sponsor any activities at the inaccessible field until it is made accessible to the disabled. Finally, the court ordered the City to modify the steel barricade blocking the entrance to another park. *See Tyler v. City of Manhattan*, 857 F.Supp. 800 (D.Kan.1994). A judgment was entered reflecting the court's order and reserving the matter of statutory costs and attorney fees. The City filed a timely motion for clarification or amendment of the court's memorandum decision or in the alternative for a new trial, which was denied. *See Tyler v. City of Manhattan*, 157 F.R.D. 508 (D.Kan.1994). The district court entered a second judgment denying the City's motion and Tyler filed his notice of appeal. The court thereafter entered a third judgment awarding plaintiff his attorney fees. *See Tyler v. City of Manhattan*, 866 F.Supp. 500 (D.Kan.1994).

S.Ct. 298, 130 L.Ed.2d 211 (1994); *Sanchez–Trujillo v. INS,* 801 F.2d 1571, 1581 n. 9 (9th Cir.1986).

■ Although this circuit has yet to address the issue, it is clear that this panel has the discretion to reach arguments raised only in an *amicus curiae* brief. *See Teague v. Lane,* 489 U.S. 288, 300, 109 S.Ct. 1060, 1069–70, 103 L.Ed.2d 334 (1989). It is equally clear, however, that we should exercise that discretion only in exceptional circumstances. *See Resident Council v. HUD,* 980 F.2d 1043, 1049 (5th Cir.), *cert. denied,* 510 U.S. 820, 114 S.Ct. 75, 126 L.Ed.2d 43 (1993); *Richardson v. Alabama State Bd. of Educ.,* 935 F.2d 1240, 1247 (11th Cir.1991); *Wiggins Bros. v. Department of Energy,* 667 F.2d 77, 83 (Temp.Emer.Ct.App.1981), *cert. denied,* 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982).

■ Our review of the relevant case law demonstrates that it is truly the exceptional case when an appellate court will reach out to decide issues advanced not by the parties but instead by *amicus.* In *Swan v. Peterson,* for instance, the Ninth Circuit refused to consider whether a criminal defendant can be convicted on the basis of hearsay alone because the issue was raised by *amicus* rather than the appellant. 6 F.3d 1373, 1383 (9th Cir. 1993), *cert. denied,* 513 U.S. 985, 115 S.Ct. 479, 130 L.Ed.2d 393 (1994). In considering the question of what constitutes exceptional circumstances, the Ninth Circuit has concluded that it will exercise its discretion only when (1) a party attempts to raise the issue by reference to the *amicus* brief; or (2) the issue "involves a jurisdictional question or touches upon an issue of federalism or comity that could be considered sua sponte." *Id.*

Applying the Ninth Circuit's analysis to the case at hand, we decline to address the issue raised by *amicus.* Tyler did not adopt *amicus'* argument by reference in his brief and none of the other exceptions referenced by the Ninth Circuit apply. Furthermore, neither the parties nor *amicus* have identified any other exceptional circumstance to justify this court's resolution of the issue presented solely by *amicus.* As a conse-

quence, Tyler has chosen to affirmatively waive the question of whether he could recover compensatory damages absent an allegation of intentional discrimination and we correspondingly do not address the issue.

Because we agree with the district court that the pretrial order does not allege intentional discrimination on the part of the City, we **AFFIRM** the order of the district court striking Tyler's claim for compensatory damages.

JENKINS, Senior District Judge, dissenting.

The district court *sua sponte* struck Mr. Tyler's compensatory damages claim under Title II of the Americans with Disabilities Act of 1990 ("ADA") from the pretrial order on the grounds that compensatory damages for mental and emotional injury were not available under Title II, at least absent intentional discrimination. The district court further concluded that Tyler had not alleged intentional discrimination in either his complaint or in the pretrial order. Tyler appealed from both of those rulings.

In affirming the district court's denial of Tyler's claim for compensatory damages, the majority adopts the district court's assumption that damages for nonpecuniary losses such as mental and emotional injuries are available under Title II only to remedy intentional discrimination and joins the district court in concluding that the pretrial order did not describe acts of intentional wrongdoing.

For the reasons stated below, I respectfully dissent.

**"INTENTIONAL DISCRIMINATION" UNDER TITLE II OF THE ADA**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[1]

---

1. It is undisputed that Mr. Tyler is a "qualified     individual with a disability" and that the City of

Title II is violated when a "qualified individual with a disability" is prevented from participating in or benefiting from a public service, program, or activity, by reason of a qualifying disability, regardless of whether the entity intended to discriminate against the disabled person, as well as when a public entity discriminates against a qualified disabled person, regardless of whether that discrimination occurs in the context of a public service, program, or activity. *See Patton v. TIC United Corp.,* 77 F.3d 1235, 1245 (10th Cir. 1996). 42 U.S.C. § 12132 itself does not speak of "intentional" discrimination as a class of injury distinct from exclusion or other forms of discrimination expressly forbidden by that statute. That distinction must therefore find its source in judicial construction of the statute.

In other areas of anti-discrimination law, courts have found it useful to distinguish between intentional discrimination, often labeled as "disparate treatment," and unintentional or incidental discrimination, labeled as "disparate impact." *See, e.g., Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 645–46, 109 S.Ct. 2115, 2118–19, 104 L.Ed.2d 733 (1989) (racial discrimination case). *Disparate treatment* occurs when a defendant treats some people less favorably than others because of an impermissible criterion, such as their race—conduct from which one may infer an intent to discriminate. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). *Disparate impact* occurs when a facially neutral practice adversely affects members of a protected group more than others regardless of whether such adverse impact was actually intended. *See id.* at 335 n. 15, 97 S.Ct. at 1854 n. 15. Moreover, in the context of other civil

rights legislation, conduct has been described as intentional when " 'the policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy, training, protocol, or custom.' " *Ferguson v. City of Phoenix,* 931 F.Supp. 688, 697 (D.Ariz.1996) (construing Rehabilitation Act) (quoting *Penney v. Town of Middleton,* 888 F.Supp. 332, 340 (D.N.H.1994)).[2] *See also Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1202–03, 103 L.Ed.2d 412 (1989).

No reported opinion of this court has yet articulated the essential elements of a claim of intentional discrimination under Title II of the ADA, or detailed what a plaintiff must plead at a minimum to establish such a claim. Nor has this court offered any specific guidance to "sharpen the inquiry into the elusive factual question of intentional discrimination," *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1094–95 n. 8, 67 L.Ed.2d 207 (1981), other than the suggestion that a plaintiff may demonstrate that challenged conduct "was motivated by discriminatory animus." *Patton v. TIC United Corp.,* 77 F.3d 1235, 1246 (10th Cir.1996). *Compare White v. York International Corp.,* 45 F.3d 357, 361 n. 6 (10th Cir.1995) (elements of prima facie case of employment discrimination and burden-shifting scheme under ADA). A reasoned elaboration of the role of disparate treatment/disparate impact analysis in the context of ADA Title II claims also appears to be lacking.[3]

Nevertheless, the majority in this case rejects Tyler's claims almost summarily, characterizing them as alleging "acts and omissions which have a disparate impact" rather than conduct reflecting disparate treatment.

Manhattan is a "public entity." *See* 42 U.S.C. § 12131 (defining these terms).

**2.** "To the extent feasible, we look to decisions construing the Rehabilitation Act to assist us in interpreting analogous provisions of the ADA." *Patton,* 77 F.3d at 1245 (citation omitted).

**3.** As the *amicus* points out, this case does not fit nicely within the traditional framework for analyzing discrimination claims. Arguably, this case does not involve either traditional disparate-treatment or disparate-impact discrimination.

As to disparate treatment, the City could argue that it treats the disabled the same as it treats everyone else. Everyone, for example, must use the stairs to access City Council meetings when the elevator is broken; there is arguably no disparate treatment and no "animus toward the disabled generally or Tyler specifically." On the other hand, one could argue that a disparate impact analysis does not apply because the City's alleged policy (not to accommodate the special needs of the disabled) is not facially neutral in light of the city's duties under ADA.

**1406**

The majority opines that the pretrial order contains neither allegations of "specific acts of intentional discrimination" against Tyler nor allegations that the City "was motivated by animus toward the disabled generally or Tyler specifically"—suggesting that Tyler's role in relevant events was entirely passive and that the City's conduct was, at its worst, almost benign. The majority concludes that Tyler failed to allege intentional discrimination, yet it does so without addressing the contrary inferences that might otherwise be drawn from Tyler's claims.

Tyler did not employ catchphrases like "intentional discrimination," "disparate treatment," or "discriminatory animus" in his pleadings. Nor was such language incorporated in the pretrial order. However, Tyler did describe conduct on the part of the City from which "intentional discrimination" rationally may be inferred, particularly if the challenged conduct is measured in terms of "deliberate indifference" in the implementation of policy. *Cf. Oxford House–C v. City of St. Louis*, 843 F.Supp. 1556, 1577 (E.D.Mo. 1994) ("Intentional discrimination [against the disabled] does not require personal animosity or ill will—it is sufficient that defendant treated plaintiffs unfavorably because of their handicap").

Count II of Tyler's Complaint alleged that the City was "excluding persons with disabilities from participation in and the benefits of services and programs, and denying persons with disabilities the opportunity to participate in and benefit from services provided by the City of Manhattan in existing facilities thereby violating Title II . . . ." In the pretrial order, Tyler's Count II claims found amplification: "Plaintiff claims that he has been excluded from attending City Council meetings, from the self-evaluation and the development of a transitionplan, from access to filing of grievance complaints, and from attendance at recreational events sponsored by the park and recreations department." Nothing in this language precludes an offer of proof that the challenged exclusions flow from deliberate indifference or discriminatory animus rather than mere inadvertence or naive ignorance. The pretrial order also elaborated upon Tyler's Count III claim, reciting that the City "has actual knowledge that it is licensing facilities which are inaccessible to persons with disabilities" and "has actual knowledge that these facilities are denying access to persons with disabilities. . . ."[4]

Indeed, Tyler may be understood to have pleaded mere inadvertence on the part of the City only if his claims are construed strictly against him and are read wholly in the light most favorable to the City.

As the majority suggests, the pretrial order does measure the dimensions of the lawsuit, but the claims falling within those dimensions ultimately turn upon the evidence presented at trial. Following the bench trial in this case, the district court found, *inter alia*, that "[t]he City continues to *knowingly* provide city programs and services in facilities identified in 1984 as having architectural barriers that deny access to persons with disabilities" and "assumes that it may continue to do so" until an individual with a disability insists on specific accommodation, and concluded that the city had discriminated against Tyler in violation of Title II "by excluding him from certain city recreational activities due to physical barriers impeding full access to wheelchair users." (Emphasis added.) The district court further found that the City had discriminated against Tyler based on his disability by not providing for him to attend a City Commission meeting when the elevator at the city hall was out of order, and by effectively denying him access to the restroom facilities at the City's municipal court building.[5]

4. If, as some cases suggest, intentional discrimination under Title II of the ADA may be shown where a disabled person has requested accommodation and been refused, it appears that Tyler requested such accommodation and was refused, at least in part. Indeed, the City in the pretrial order claimed "undue hardship as to . . . compliance with plaintiff's request for accommodation as set forth in Count II of plaintiff's factual contentions herein."

5. Finding that the City's self-evaluation and transition plans did not comply fully with federal regulations, the district court ordered the City to adopt a schedule for installing curb ramps and to complete a self-evaluation of its current services, policies and practices consistent with federal reg-

In light of all of this, I am not persuaded that as a matter of law, Tyler's pleadings and the pretrial order did not embrace intentional discrimination by the City in violation of Title II of the ADA. Beyond that, I am also not persuaded that simply labeling his claims as alleging "disparate impact" resolves the question of Tyler's entitlement to compensatory damages under Title II of the ADA.

## DISPARATE TREATMENT, DISPARATE IMPACT AND COMPENSATORY DAMAGES UNDER TITLE II OF THE ADA

In contrast to the district court's ruling below, other recent cases have readily acknowledged that "compensatory damages are available to plaintiffs asserting claims under [Title II of the ADA,] 42 U.S.C. § 12132," *Niece v. Fitzner*, 922 F.Supp. 1208, 1219 (E.D.Mich.1996), and some suggest that in the specific context of Title II of the ADA, the compensatory damages remedy may not depend upon proof of intentional discrimination. *See id.* at 1219 n. 9. *See also Hernandez v. City of Hartford*, 959 F.Supp. 125, 133–34 (D.Conn.1997) ("Since claims for compensatory and punitive damages are proper under § 504 of the Rehabilitation Act, they are likewise appropriate under ADA.").

Broad enough to cover both disparate-treatment and disparate-impact discrimination both within and beyond the workplace, the ADA also covers other forms of discrimination, including the failure to make reasonable accommodations for the disabled and afford meaningful access to goods, services, jobs, facilities, programs and activities. *See generally* 42 U.S.C. §§ 12112(b) & 12182(b) (defining discrimination against the disabled under Titles I and III of the ADA). *See also* H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367 (Title II prohibits the same forms of discrimination as Titles I and III of the

ADA). The traditional disparate treatment/disparate impact analyses apply when one who is entitled to *equal* treatment claims that he experienced unequal treatment or uneven consequence. But here, under Title II of the ADA, the City has an affirmative duty to act. Tyler claims he was entitled to *special* treatment, to accommodation by the City of his own special circumstances. In such cases, these traditional analyses prove less helpful. *See Justice v. Pendleton Place Apartments*, 40 F.3d 139, 144 n. 6 (6th Cir. 1994) (Title VI's "intentional discrimination" requirement "does not translate well into cases such as this one where the alleged discrimination [housing discrimination against handicapped persons] is not 'intentional' in the usual sense of the word"); *Elliott v. City of Athens*, 960 F.2d 975, 987 (11th Cir.) (Kravitch, J., dissenting) ("a disparate impact analysis is particularly inappropriate in the situation of handicapped individuals" and "in fact negates the entire intent of including handicapped people" within antidiscrimination statutes), *cert. denied*, 506 U.S. 940, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992), *abrogated on other grounds by City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995).[6]

In enacting the ADA, Congress recognized that discrimination against the disabled is often the product of indifference rather than animosity. *See* H.R.Rep. No. 485(II), at 29, *reprinted in* 1990 U.S.C.C.A.N. at 310–11. Congress also recognized that the effect of discrimination against the disabled is the same, however, whether the motivation is malicious or benign. *See* H.R.Rep. No. 711, 100th Cong., 2d Sess. 25 (1988) ("Acts that have the effect of causing discrimination [against the handicapped] can be just as devastating as intentional discrimination"), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2186. Where, as here, Congress has mandated that public entities take affirmative steps to make

---

ulations. The district court also ordered the City to relocate any City-sponsored ball games presently scheduled for an inaccessible field at one park to other fields and not to offer any other activities at the field until it is made accessible to the handicapped. Finally, the court ordered the City to modify the steel barricade blocking the entrance to another park. *Tyler v. City of Manhattan*, 857 F.Supp. 800, 812–22 (D.Kan.1994).

**6.** *But see Kelly v. Boeing Petroleum Servs.*, 61 F.3d 350, 365 (5th Cir.1995) (a failure-to-accommodate claim involves disparate treatment and therefore requires a showing of intentional discrimination).

reasonable accommodations for the disabled, an entity's subjective motivation in failing to carry out its statutory obligations (that is, whether its failure to act was the product of intentional discrimination against the disabled or of neglect or indifference) should not be dispositive. "[E]ffect, and not motivation," should be the "touchstone" of an ADA claim. *United States v. City of Black Jack*, 508 F.2d 1179, 1185 (8th Cir.1974) (referring to Fair Housing Act claims), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975).

### A. *The Statutory Framework*

The remedies available for the violation of a statute depend in the first instance on the terms of the statute itself, since Congress is always free to define and limit the remedies for a right of action it creates. To understand the remedies available for a violation of Title II of the ADA, we must take an extended detour through the United States Code.

Title II's enforcement provision, 42 U.S.C. § 12133, incorporates the remedy provisions of section 505 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a: "The remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title." Section 505 of the Rehabilitation Act in turn incorporates selected remedy provisions of the Civil Rights Act of 1964, including remedies available under Titles VI and VII of the 1964 Act. *See* 29 U.S.C. § 794a (1994).

It is not at all clear which provisions of the 1964 Civil Rights Act Congress intended to incorporate into Title II of the ADA, since section 505 of the Rehabilitation Act "incorporates two separate and very distinct sets of remedies, procedures, and rights." *Johnson–Goeman v. Michigan Dep't of Commerce*, No. 5:93–CV–119, 1995 WL 313707, at *4 (W.D.Mich. Jan.18, 1995). Section 505(a)(1) provides that the remedies set forth in section 717 of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–16, "shall be available, with respect to any complaint under section 501 of this Act, to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by the failure to take final action on such complaint." Pub.L. No. 95–602, § 120(a), 92 Stat. 2955, 2982 (1978) (*codified at* 29 U.S.C. § 794a(a)(1)).[7] Section 505(a)(2) provides that the remedies set forth in Title VI of the Civil Rights Act, 42 U.S.C. §§ 2000d through 2000d–4, "shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 504 of this Act." 92 Stat. at 2983 (*codified at* 29 U.S.C. § 794a(a)(2)).[8] Neither of these provisions squarely applies to a violation of Title II of the ADA, since neither an employment complaint nor the receipt of federal assistance is required for a Title II violation. *See* H.R.Rep. No. 485(II), at 37, 47, 84, *reprinted in* 1990 U.S.C.C.A.N. at 318–19, 329, 366–67 (the ADA was meant to reach state and local programs that do not receive federal funds).[9] The City and *amicus* both agree, however, that section 505(a)(2), 29 U.S.C. § 794a(a)(2), which incorporates Title VI's remedies, is the applicable statute in this case.[10]

---

**7.** Section 501 of the Rehabilitation Act governs employment of the handicapped. *See* 29 U.S.C. § 791 (1994).

**8.** Section 504 of the Rehabilitation Act prohibits discrimination against the handicapped generally in programs receiving federal funds. *See* 29 U.S.C. § 794.

**9.** The district court held that to establish a violation of Title II, a plaintiff need only show that he is a qualified individual with a disability and that he was excluded from participation in or denied the benefits of a public entity's services, programs, or activities or otherwise discriminated against by the public entity by reason of his

disability. *Tyler v. City of Manhattan*, 857 F.Supp. at 817.

**10.** Courts that have considered the issue have also concluded that ADA claims not based on discrimination in employment are governed by section 505(a)(2). *See, e.g., Johnson–Goeman*, 1995 WL 313707, at *4–5. *Cf. Rodgers v. Magnet Cove Pub. Sch.*, 34 F.3d 642, 643–44 (8th Cir. 1994) (looking to Title VI remedies in an employment case under the Rehabilitation Act); *Waldrop v. Southern Co. Servs., Inc.*, 24 F.3d 152, 155 (11th Cir.1994) (same); *Pandazides v. Virginia Bd. of Ed.*, 13 F.3d 823, 827, 829–30 (4th Cir. 1994) (same); *Eastman v. Virginia Polytechnic Inst.*, 939 F.2d 204, 206 (4th Cir.1991) (same).

Title VI of the 1964 Civil Rights Act itself does not contain a specific remedy provision. *See Waldrop,* 24 F.3d at 155 ("Title VI does not discuss the procedures or penalties available to a private party alleging discrimination under the statute"); *Pandazides,* 13 F.3d at 827–28 (accord). As originally enacted, Title VI merely authorized the government to cut off federal funding for programs that discriminated on the ground of race, color or national origin. *See* Pub.L. No. 88–352, title VI, 78 Stat. 241, 252–53 (1964). However, in 1986, Congress amended the Rehabilitation Act of 1973 to abrogate states' Eleventh Amendment immunity from suits alleging violations of any federal statute "prohibiting discrimination by recipients of Federal financial assistance," including Title VI. *See* Pub.L. No. 99–506, § 1003(a)(1), 100 Stat. 1807, 1845 (1986) (codified as 42 U.S.C. § 2000d–7). The amendment further provided, that, in a suit against a state for a violation of such a statute, "remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State." *Id.* § 1003(a)(2). Although the 1986 amendment was not enacted as part of Title VI and does not specify the remedies available for a violation of Title VI, the Supreme Court has interpreted it as acknowledging the availability of at least some private remedies for violations of antidiscrimination statutes, including Title VI. *See Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 72–73, 112 S.Ct. 1028, 1036–37, 117 L.Ed.2d 208 (1992).

By incorporating one section after another by reference—sections that mesh only imperfectly—Congress could not have made its intention less clear. Nevertheless, I have found nothing in the language of the relevant

statutes that precludes an award of compensatory damages for emotional distress for a violation of Title II of the ADA. The general rule that, "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute," *id.* at 70–71, 112 S.Ct. at 1035, finds application here as well.

## B. The Presumption in Favor of All Appropriate Remedies

Tyler asserts that absent a clear direction to the contrary by Congress, the federal courts presumably have the power to award any appropriate relief in an action arising under a federal statute, and that the district court's treatment of compensatory damages under Title II of the ADA conflicts with *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 72–73, 112 S.Ct. 1028, 1036–37, 117 L.Ed.2d 208 (1992), which applied this presumption in affirming that compensatory damages are available in private actions brought under Title IX of the Education Amendments Act of 1972.

Starting with the "traditional presumption" that, when "legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done," 503 U.S. at 66, 112 S.Ct. at 1033 (quoting *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946)), the *Franklin* Court reasoned that Congress had enacted and amended Title IX with full knowledge of the presumption and of Supreme Court precedent recognizing damage remedies for implied causes of action and concluded that Congress, by its acquiescence in this established law, must not have intended to limit application of this general principle. *Id.* at 71–73, 112 S.Ct. at 1035–37.[11]

---

11. The Court noted that Congress had twice amended Title IX after the Court had first recognized an implied right of action under Title IX— once in the Rehabilitation Act Amendments of 1986 and again in the Civil Rights Restoration Act of 1987. Both broadened the coverage under Title IX, and neither purported "to alter the traditional presumption in favor of any appropriate relief for violation of a federal right." 503 U.S. at 73, 112 S.Ct. at 1036. In fact, as noted above, the 1986 amendment provided that, in a suit against a state, "remedies (*including remedies both at law and in equity*) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State." *See* 42 U.S.C. § 2000d–7(a)(2) (emphasis added). Three members of the Court found this provision dispositive, as "an implicit acknowledgment" by Congress that damages are available under Title IX. *See* 503 U.S. at 78, 112

The Court therefore concluded that "a damages remedy is available for an action brought to enforce Title IX." *Id.* at 76, 112 S.Ct. at 1038.

The City argues that *Franklin* "reaffirmed the continued vitality" of *Guardians Association v. Civil Service Commission,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), and *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984), which, the City claims, "held that only limited remedies were available for violations of both Title VI and The Rehabilitation Act."

It seems the City reads too much into those cases.

There was no clear holding of the Court in *Guardians.* The Court in that case affirmed a judgment denying compensatory relief in a disparate-impact case under Title VI, but no opinion commanded a majority of the Court.[12] The Court in *Darrone* merely held that section 504 of the Rehabilitation Act clearly "authorizes a plaintiff who alleges intentional discrimination to bring an equitable action for backpay." 465 U.S. at 630, 104 S.Ct. at 1252. The Court expressly left open the question of "the extent to which money damages are available under § 504." *Id.*

The Court in *Franklin* explained its prior decisions as follows:

> Though the multiple opinions in *Guardians* suggest the difficulty of inferring the common ground among the Justices in that case, a clear majority expressed the view

that damages were available under Title VI in an action seeking remedies for an intentional violation, and no Justice challenged the traditional presumption in favor of a federal court's power to award appropriate relief in a cognizable cause of action.... The correctness of this inference was made clear the following Term when the Court unanimously held that the 1978 amendment to § 504 of the Rehabilitation Act of 1973—which had expressly incorporated the "remedies, procedures, and rights set forth in title VI" (29 U.S.C. § 794a(a)(2))—authorizes an award of backpay. In *Darrone,* the Court observed that a majority in *Guardians* had "agreed that retroactive relief is available to private plaintiffs for all discrimination ... that is actionable under Title VI." ... The general rule, therefore, is absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute.

503 U.S. at 70, 112 S.Ct. at 1035 (citations omitted). *Guardians* and *Darrone* affirmed the right of a private plaintiff to recover damages under Title VI and the Rehabilitation Act at least under some circumstances, but neither definitively described or limited the scope of remedies under those statutes. Thus, neither is dispositive of this case.

---

S.Ct. at 1039 (Scalia, J., concurring in the judgment, joined by Rehnquist, C.J., and Thomas, J.).

**12.** Justice White, who announced the judgment of the Court, concluded that discriminatory intent was not an essential element of a Title VI violation but that only injunctive relief should be available for unintentional violations of Title VI. 463 U.S. at 593, 602–03, 607, 103 S.Ct. at 3227–28, 3232–33, 3235. (Justice Rehnquist joined the latter conclusion.) Justice Powell, joined by Chief Justice Burger, would have held that there is no private right of action under Title VI, *id.* at 608–10, 103 S.Ct. at 3235–37, but that, in any event, Title VI reaches only intentional discrimination. *Id.* at 610–11, 103 S.Ct. at 3236–37. (Justice Rehnquist also joined this latter conclusion.) Justice O'Connor concluded that proof of purposeful discrimination was a necessary element of a valid Title VI claim and that the regulations under Title VI, which purported to prohibit actions having a disparate impact, were

invalid. *Id.* at 612, 103 S.Ct. at 3237–38. In Justice O'Connor's view, "all relief should be denied unless discriminatory intent is proved." *Id.* at 607 n. 27, 103 S.Ct. at 3235 n. 27 (per White, J.). Thus, a majority of the Court in *Guardians* "would not allow compensatory relief [under Title VI] in the absence of proof of discriminatory intent." *Id.* However, the Court has since rejected any idea that *Guardians* supports the "blanket proposition that federal law proscribes only intentional discrimination against the handicapped" and has cautioned against extending Title VI's intentional discrimination requirement to actions under section 504 of the Rehabilitation Act. *See Alexander v. Choate,* 469 U.S. 287, 294 & n. 11, 295–97, 105 S.Ct. 712, 716, 83 L.Ed.2d 661 (1985). The Court has assumed that section 504 reaches at least some conduct that has an unintended disparate impact on the handicapped. *Id.* at 299, 105 S.Ct. at 719.

I recognize that *Franklin* is not directly on point. The Court in *Franklin* was dealing with the remedies available in an implied right of action, not one that Congress had expressly created. Obviously, Congress had not expressly enumerated remedies under Title IX for a private cause of action which itself exists entirely by implication. Here, on the other hand, Congress has specified a remedy, at least in a roundabout way.

The Supreme Court has declined to extend *Franklin*'s presumption of all available remedies to all federal statutory causes of action. It does not apply in Title VII cases because Title VII "did not create a 'general right to sue' ... but instead specified a set of 'circumscribed remedies.'" *Landgraf v. USI Film Prods.*, 511 U.S. 244, 285–86 n. 38, 114 S.Ct. 1483, 1508 n. 38 (1994).[13] Title VII, unlike Title II of the ADA, clearly spells out the remedies available for its violation. *See* 42 U.S.C. § 2000e–5(g) (1988). Until 1991, "the Title VII scheme did not allow for damages." 511 U.S. at 285–86 n. 38, 114 S.Ct. at 1508 n. 38. The *Landgraf* Court concluded that it was "not free to fashion remedies that Congress has specifically chosen not to extend." *Id.* at 286 n. 38, 114 S.Ct. 1508 n. 38.

Here, the statutory remedies provisions furnish no "clear direction" indicating Congress specifically chose *not* to extend the compensatory damages remedy to causes of action under Title II of the ADA. *Franklin*'s presumption in favor of all available remedies should apply not only where Congress creates a "general right to sue" without specifying any remedies, but also where Congress provides for remedies in general terms, but

does not clearly delineate the scope of those remedies or expressly exclude specific remedies that otherwise would be available.[14]

## C. Context and Legislative History

Having found no clear expression of congressional intent in the statutory language of Title II, the legislative history and context may shed some light on whether Congress intended to limit the compensatory damages remedy and defeat the application of the traditional presumption that all appropriate remedies remain available for the enforcement of Title II.

It may be argued that Congress must have intended to limit any recovery under the ADA to pecuniary loss because, at the time it enacted the statute (July 1990), most of the courts that had considered the question had concluded that emotional distress damages were not available under the Rehabilitation Act. *See, e.g., Rhodes v. Charter Hosp.*, 730 F.Supp. 1383, 1385–86 (S.D.Miss.1989) (citing *Marshburn v. Postmaster Gen.*, 678 F.Supp. 1182 (D.Md.), *aff'd*, 861 F.2d 265 (4th Cir. 1988); *Shuttleworth v. Broward County*, 649 F.Supp. 35 (S.D.Fla.1986); *Martin v. Cardinal Glennon Memorial Hosp.*, 599 F.Supp. 284 (E.D.Mo.1984); *Bradford v. Iron County C–4 Sch. Dist.*, 37 Empl. Prac. Dec. (CCH) ¶ 35,404 (E.D.Mo.1984)). *Cf. Franklin*, 503 U.S. at 71–72, 112 S.Ct. at 1035–36 (in determining Congress's intent to limit remedies under Title IX, the Court must consider "the state of the law" when Title IX was passed). Most of those cases, however, arose in the employment context, and the remedies for employment discrimination under both the

---

**13.** At oral argument, the City argued that *Landgraf* controls this case. *Landgraf*, however, dealt with a different issue, namely, the retroactive effect of the Civil Rights Act of 1991, which created a right to recover compensatory and punitive damages for certain violations of Title VII. *Landgraf* says nothing about the remedies available under Title II of the ADA or the statutes to which it looks for its remedies, the Rehabilitation Act and Title VI. The Supreme Court has recognized that "the circumscribed remedies available under Title VII stand in marked contrast ... to those available under ... other federal antidiscrimination statutes...." *United States v. Burke*, 504 U.S. 229, 240, 112 S.Ct. 1867, 1873, 119 L.Ed.2d 34 (1992). When the Civil Rights Act of 1991 was enacted, damages were

not available under Title VII. *Landgraf*, 511 U.S. at 285–86 n. 38, 114 S.Ct. at 1507–08 n. 38. The case law under Title II and its incorporated statutes, however, did not unequivocally preclude compensatory damages. In its brief, the City acknowledges that the Civil Rights Act of 1991 (and hence *Landgraf*) does not apply to Tyler's claims.

**14.** To hold otherwise would lead to the anomalous result that "the most questionable of private rights"—those "not consciously and intentionally created" by Congress but merely implied by the courts—"will also be the most expansively remediable." *See Franklin*, 503 U.S. at 78, 112 S.Ct. at 1039 (Scalia, J., concurring in the judgment).

Rehabilitation Act and the ADA remain more closely circumscribed than the remedies for violations of those statutes' general prohibition against discrimination. Where employment discrimination is at issue, both the Rehabilitation Act and the ADA have been read to incorporate Title VII remedies, not Title VI remedies. *Compare* 29 U.S.C. § 794a(a)(1) & 42 U.S.C. § 12117(a) *with* 29 U.S.C. § 794a(a)(2) & 42 U.S.C. § 12133.

Moreover, none of the cases acknowledged, much less purported to apply *Bell v. Hood*'s presumption (reaffirmed in *Franklin*) in favor of all available remedies. In fact, it may be that the pre-*Franklin* cases "were asking the wrong question"—namely, whether Congress had clearly authorized monetary damages—rather than whether Congress had clearly restricted the remedies otherwise available. *Justice v. Pendleton Place Apartments*, 40 F.3d 139, 142–43 (6th Cir.1994).[15]

Perhaps even more important, the case law under the Rehabilitation Act was not uniform in its results. Some courts had allowed recovery for nonpecuniary losses. *See Fitzgerald v. Green Valley Area Educ. Agency*, 589 F.Supp. 1130, 1138 (D.Iowa 1984) (allowing damages for mental anguish); *Hurry v. Jones*, 560 F.Supp. 500, 511–12 (D.R.I.1983) (allowing compensatory damages for pain and suffering), *aff'd in part, rev'd in part*, 734 F.2d 879 (1st Cir.1984).[16] Other courts had recognized that damages were available under the Rehabilitation Act without expressly limiting the types of damages available. *See, e.g., Kling v. County of Los Angeles*, 769 F.2d 532, 534 (9th Cir.), *rev'd on other grounds*, 474 U.S. 936, 106 S.Ct. 300, 88 L.Ed.2d 277 (1985); *Miener v. Missouri*, 673 F.2d 969, 977–79 (8th Cir.), *cert. denied*, 459 U.S. 909, 916, 103 S.Ct. 215, 230, 74 L.Ed.2d 171, 182 (1982); *Bachman v. American Soc'y of Clinical Pathologists*, 577 F.Supp. 1257, 1262 (D.N.J.1983); *Patton v. Dumpson*, 498 F.Supp. 933, 937–39 (S.D.N.Y.1980). *Cf. Pushkin v. Regents of the Univ. of Colo.*, 658 F.2d 1372, 1378 n. 2 (10th Cir.1981) (recognizing a split of authority over whether there is a private right of action for damages under the Rehabilitation Act). In short, at the time the ADA was enacted, the question of what monetary remedies were available under the Rehabilitation Act was a "murky" one. *Parks v. Pavkovic*, 753 F.2d 1397, 1409 (7th Cir.), *cert. denied*, 473 U.S. 906, 474 U.S. 918, 105 S.Ct. 3529, 106 S.Ct. 246, 87 L.Ed.2d 653, 88 L.Ed.2d 255 (1985). *See also Georgia State Conference of Branches of NAACP v. Georgia*, 775 F.2d 1403, 1428 (11th Cir.1985); *Manecke v. School Bd.*, 762 F.2d 912, 921 n. 8 (11th Cir.1985), *cert. denied*, 474 U.S. 1062, 106 S.Ct. 809, 88 L.Ed.2d 784 (1986).[17]

Thus, one cannot say from the state of the law when Congress enacted Title II of the ADA that Congress clearly intended to limit the available remedies by excluding compensatory damages.

At least one member of Congress thought that compensatory damages were available under section 505 of the Rehabilitation Act. In the floor debates, Senator Harkin, the chief sponsor of the ADA in the Senate, stated his understanding that damages were available under Title II because they were available under section 505:

> It is true that the employment provisions of title I make available the rights and remedies of title VII of the 1964 Civil Rights Act, which provides for backpay

**15.** "The pre-*Franklin* cases thus have limited applicability." *Moreno v. Consolidated Rail Corp.*, 63 F.3d 1404, 1417 (6th Cir.), *reh'g en banc granted, opinion vacated*, 70 F.3d 433 (6th Cir. 1995).

**16.** Although the First Circuit reversed the district court's award of damages in *Hurry*, it did so not because compensatory damages for emotional suffering were not available under the Rehabilitation Act but because compensatory damages were not available under the Education for All Handicapped Children Act (EAHCA). The court concluded that the plaintiff could not avoid the EAHCA's damage limitation by recourse to "the

arguably broader remedy of the Rehabilitation Act." 734 F.2d at 886.

**17.** Similarly, the case law under Title VI was inconclusive. *Compare, e.g., Bachman*, 577 F.Supp. at 1262 (monetary damages were available under Title VI); *Gilliam v. City of Omaha*, 388 F.Supp. 842, 847 (D.Neb.) (accord), *aff'd*, 524 F.2d 1013 (8th Cir.1975), *with Rendon v. Utah State Dep't of Employment Sec. Job. Serv.*, 454 F.Supp. 534, 535–36 (D.Utah 1978) (Title VI does not provide a plaintiff with a private cause of action for general damages).

and equitable relief. Also, under the public accommodations provisions of title III, the bill expressly limits relief to equitable remedies. *However, title II of the act, covering public services, contains no such limitation.* Title II of the bill makes available the rights and remedies also available under section 505 of the Rehabilitation Act, and *damages remedies are available under that provision enforcing section 504 of the Rehabilitation Act and, therefore, also under title II of this bill.*

135 Cong. Rec. S10755 (daily ed. Sept. 7, 1989) (emphasis added).

Other legislative history also supports this conclusion and shows that Congress intended the disabled to have a private right of action to enforce Title II that would include the "full panoply of remedies." *See* H.R.Rep. No. 485(II), at 98, *reprinted in* 1990 U.S.C.C.A.N. at 381; H.R.Rep. No. 485(III), 101st Cong., 2d Sess. 52 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 475. It was thought that anything less "would make the ADA an 'empty promise of equality.'" H.R.Rep. No. 485(II), at 40, *reprinted in* 1990 U.S.C.C.A.N. at 322 (citation omitted).[18]

Moreover, the subsequent history of the ADA suggests that Congress never specifically intended to limit the remedies available under Title II. In the Civil Rights Act of 1991, Congress provided for limited damage remedies under certain civil rights statutes, including Title I of the ADA. *See* Pub.L. No. 102–166, § 102, 105 Stat. 1071, 1072–74 (1991) (codified at 42 U.S.C. § 1981a). However, Congress did not see fit to limit the remedies available under Title II of the ADA (or under Title VI or sections 504 and

505(a)(2) of the Rehabilitation Act, the statutes Title II incorporates).

Other provisions of the ADA also support the conclusion that Congress did not intend to limit the presumption in favor of all appropriate remedies when it enacted Title II. For example, section 501 of the ADA provides that nothing in the act "shall be construed to invalidate or limit the remedies, rights and procedures of any Federal law or law of any State ... that provides greater or equal protection for the rights of individuals with disabilities" than are afforded by the ADA. Pub.L. No. 101–336, § 501(b), 104 Stat. 327, 369 (1990) (codified at 42 U.S.C. § 12201(b)). Section 502 of the ADA abrogates states' Eleventh Amendment immunity and further provides that, "[i]n any action against a State for a violation of the requirements of this Act, remedies (*including remedies both at law and in equity*) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State." *Id.* § 502, 104 Stat. at 370 (emphasis added) (codified at 42 U.S.C. § 12202).[19]

In short, I have found nothing in the language or history of Title II to show that Congress intended to alter the traditional presumption in favor of all available remedies, despite the fact that Congress has had ample opportunity to limit the remedies available under Title II and its predecessor statutes, as evidenced by its amendment of other parts of the civil rights legislative package. Given *Franklin*'s presumption, I therefore conclude that all appropriate remedies are available for a violation of Title II, including compensatory damages for emo-

---

18. Congress deleted a provision from Title I of the ADA, covering employment, that would have expressly allowed compensatory and punitive damages and instead adopted Title VII remedies (injunctive relief, reinstatement, back pay and attorney fees) for violations of Title I. *See* H.R.Rep. No. 485(II), at 164, 167 (minority views), *reprinted in* 1990 U.S.C.C.A.N. at 441, 444; H.R.Rep. No. 485(III), at 88 (additional views of certain Congressmen), *reprinted in* 1990 U.S.C.C.A.N. at 506. Although at least some members of Congress also favored limiting remedies under Title III (covering public accommodations and services operated by private entities),

*see* H.R.Rep. No. 485(II), at 166, *reprinted in* 1990 U.S.C.C.A.N. at 444, I have found no evidence that Congress intended to limit Title II remedies.

19. The Supreme Court in *Franklin* found the virtually identical provision of the Rehabilitation Act Amendments of 1986 significant in concluding that the implied private right of action under Title IX included a right to recover monetary damages. 503 U.S. at 72–73, 112 S.Ct. at 1036–37; *see id.* at 78, 112 S.Ct. at 1039 (Scalia, J., concurring in the judgment).

tional distress where appropriate.[20]  If Congress wants to limit the remedies available under Title II, it knows how to clearly say so. *Cf.* 42 U.S.C. § 1981a(b)(3).

### D.  *The Presumption Against Compensatory Damages for Violations of Spending Clause Legislation*

The City argues, however, that the presumption in favor of all appropriate remedies is overcome by another presumption, namely, that when Congress enacts a statute pursuant to its spending power, it does not intend an unintentional violation of the statute to trigger the full panoply of remedies.  A majority of the Supreme Court has never recognized this presumption.  The genesis of the asserted presumption is the Court's decision in *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).  The Court in that case noted that "the typical remedy for state noncompliance with federally imposed conditions [on the receipt of federal funds] is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State."  451 U.S. at 28, 101 S.Ct. at 1545.  The Court did not decide the question of remedy, however, but left that issue to the court of appeals on remand.  *Id.* at 29–30, 101 S.Ct. at 1546–47.

Two Justices have interpreted *Pennhurst* as creating a rebuttable presumption "that only limited injunctive relief should be granted as a remedy for unintended violation of statutes passed pursuant to the spending power."  *See Guardians Ass'n v. Civil Serv.*

*Comm'n*, 463 U.S. 582, 602, 103 S.Ct. 3221, 3232, 77 L.Ed.2d 866 (1983) (opinion of White, J., joined by Rehnquist, J.).  That interpretation, however, has never garnered a majority of the Court.  *See Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 630–31 n. 9, 104 S.Ct. 1248, 1252–53 n. 9, 79 L.Ed.2d 568 (1984) (a majority of the Court has agreed that at least retroactive relief is available to victims of all discrimination, intentional or unintentional, that is actionable under Title VI).  In any event, the ADA is an exercise of Congress's broad powers under the Commerce Clause and the Fourteenth Amendment, not of the spending power.  *See* 42 U.S.C. § 12101(b)(4).

The City argues that, regardless of the constitutional basis for the ADA, the Rehabilitation Act and Title VI are exercises of Congress's spending power and provide the exclusive remedies for Title II violations.  If compensatory damages for unintentional violations of those statutes are not available, it argues, they should not be available for unintentional violations of Title II.

Section 505 and Title VI may define the remedies available for a violation of Title II, but they do not necessarily define the conditions under which those remedies are available.  *Cf. Alexander v. Choate*, 469 U.S. 287, 292–99, 105 S.Ct. 712, 715–19, 83 L.Ed.2d 661 (1985) (intentional discrimination is not necessarily required for a claim under the Rehabilitation Act simply because intentional discrimination is required for a claim under Title VI, the statute to which the Rehabilita-

---

**20.**  Other courts addressing the issue after *Franklin* have also concluded that compensatory damages are available under Title VI and the Rehabilitation Act and thus also under Title II.  *See W.B. v. Matula*, 67 F.3d 484, 494 (3d Cir.1995) (money damages are available under section 504 of the Rehabilitation Act); *Rodgers v. Magnet Cove Pub. Sch.*, 34 F.3d 642, 644 (8th Cir.1994) ("all legal and equitable remedies are available" under Title VI and section 504); *Waldrop v. Southern Co. Servs., Inc.*, 24 F.3d 152, 157 (11th Cir.1994) (section 504 "provides the full panoply of remedies, legal and equitable, to a successful plaintiff," as does Title VI).  *See also Pandazides v. Virginia Bd. of Ed.*, 13 F.3d 823, 830–32 (4th Cir.1994) (a full panoply of legal remedies are available under section 504, at least for intentional violations of the statute); *Miller v. Spicer*, 822 F.Supp. 158, 167–68 (D.Del.1993) (compen-

satory damages are available for intentional violations of Title VI and section 504); *Kraft v. Memorial Medical Ctr., Inc.*, 807 F.Supp. 785, 792 (S.D.Ga.1992) (accord); *Doe v. District of Columbia*, 796 F.Supp. 559, 571–73 (D.D.C.1992) (compensatory damages for emotional pain available under section 504 for intentional discrimination); *Tanberg v. Weld County Sheriff*, 787 F.Supp. 970, 972 (D.Colo.1992) (accord).  The Fourth Circuit had previously held that section 504 of the Rehabilitation Act did not permit either compensatory damages for pain and suffering or punitive damages.  *Eastman v. Virginia Polytechnic Inst.*, 939 F.2d 204, 209 (4th Cir. 1991).  However, that court later concluded that *Eastman* "can no longer be considered good law" in light of *Franklin*.  *See Pandazides*, 13 F.3d at 830.

tion Act looks for its remedies). *Franklin* confirmed that compensatory damages are available for at least some violations of Spending Clause legislation. 503 U.S. at 74–75, 112 S.Ct. at 1037–38.

The rationale for limiting damages to intentional violations of such statutes does not apply here. "The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award." *Id.* at 74, 112 S.Ct. at 1037. "Remedies to enforce spending power statutes must respect the privilege of the recipient of federal funds to withdraw and terminate its receipt of federal money rather than assume the further obligations and duties that a court has declared are necessary for compliance." *Guardians,* 463 U.S. at 597, 103 S.Ct. at 3229–30 (opinion of White, J.). Here, the receipt of federal funds is not a prerequisite to liability under the statute. A public entity subject to Title II does not have the option not to comply with the statute and thus not receive federal funds. Moreover, the entity is clearly on notice that noncompliance can subject it to liability under Title II.

Where, as here, a plaintiff does not bring an action until after he has asked a public entity to comply with its statutory obligations and the entity has refused, "there can be no question" as to what the defendant's obligation under the statute is "and no question that the [defendant] was aware of that obligation." *Id.* In the specific context of Title II of the ADA, allegations showing the defendant's failure to act in the face of its affirmative statutory obligation and its explicit potential liability affords an adequate ground for imposition of compensatory damages liability in favor of an aggrieved plaintiff—one equivalent in force to allegations of "intentional discrimination" or "discriminatory animus" explicitly pleaded as such.

E. *The Appropriateness of Compensatory Damages for Emotional Distress*

If, consistent with *Franklin,* "all appropriate remedies" are available for a violation of Title II, the question then arises whether monetary damages for nonpecuniary losses such as emotional distress and humiliation are an "appropriate" remedy for a violation of Title II.

Ordinarily, compensatory damages include damages for mental and emotional injuries. *See, e.g.,* 42 U.S.C. § 1981a(b)(3); *Carey v. Piphus,* 435 U.S. 247, 264, 98 S.Ct. 1042, 1052–53, 55 L.Ed.2d 252 (1978); *Simineo v. School Dist. No. 16,* 594 F.2d 1353, 1355, 1357 (10th Cir.1979); *Weatherford v. Birchett,* 158 Va. 741, 164 S.E. 535, 537 (1932); *Carmichael v. Bell Tel. Co.,* 157 N.C. 21, 72 S.E. 619, 620 (1911); 1 Jerome H. Nates et al., *Damages in Tort Actions* §§ 3.00 & 3.01 (1995). Title II is a remedial, civil rights statute and, as such, should be broadly construed. *See e.g., Owen v. City of Independence,* 445 U.S. 622, 636, 100 S.Ct. 1398, 1408, 63 L.Ed.2d 673 (1980) (citation omitted); *Moyo v. Gomez,* 40 F.3d 982, 985 (9th Cir. 1994), *cert. denied,* 513 U.S. 1081, 115 S.Ct. 732, 130 L.Ed.2d 635 (1995). Moreover, actions under Title II and its incorporated statutes are "tort-like" in nature, *id.* at 651–54, 100 S.Ct. at 1416, and are "analogous to personal injury claims," *Pandazides v. Virginia Bd. of Ed.,* 13 F.3d 823, 829 (4th Cir. 1994) (citation omitted). *Cf. United States v. Burke,* 504 U.S. 229, 237–42, 112 S.Ct. 1867, 1872–75, 119 L.Ed.2d 34 (1992) (Title VII claims are not tort-like and therefore Title VII awards are not excludable from gross income for federal income tax purposes). "[O]ne of the hallmarks of traditional tort liability is the availability of a broad range of damages to compensate the plaintiff 'fairly for injuries caused by the violation of his legal rights,'" including redress for "intangible elements of injury that are 'deemed important, even though not pecuniary in [their] immediate consequence[s],'" such as emotional distress. *Burke,* 504 U.S. at 235, 112 S.Ct. at 1871 (citations omitted). *See also Henry v. Gross,* 803 F.2d 757, 768 (2d Cir. 1986) (under tort law in general and civil rights law in particular, compensable injuries may include not only monetary losses but also injuries such as personal humiliation and mental anguish).

The City argues that compensatory damages for emotional distress are not necessary to make a plaintiff whole and that "complete

relief can be afforded by the exercise of injunctive power." Yet the City's reasoning seemingly stands the proper analysis on its head. Equitable remedies normally are available only when the remedy at law is inadequate, not the other way around. *See Franklin,* 503 U.S. at 75–76, 112 S.Ct. at 1037–38. Nor am I persuaded that equitable remedies such as injunctive relief afford complete relief in a case such as this. If the City's liability for violating Title II were limited to injunctive relief—that is, to an order requiring the City to do what it is already obligated to do under the statute—the City would have no further incentive to police its own compliance with the statute. I believe that the compensatory damages remedy is necessary to make whole those injured by violations of the statute and to deter future violations of the statute. Compensatory damages in turn may include damages for nonpecuniary losses such as emotional distress and mental anguish in cases where the particular circumstances warrant such relief.

### CONCLUSION

Mr. Tyler argues that his claims below embraced "intentional discrimination." I conclude his position has arguable merit. Mr. Tyler has asked this court whether the district court's reasoning comports with *Franklin* and its progeny in its treatment of private civil remedies under the ADA, and I believe that he is entitled to an answer.

While the majority's disposition of this matter is carefully drawn with reference to its reasoning as to the respective roles of parties and *amicus,* I am concerned that this court's judgment may too easily be misread as an implicit ratification of the district court's reasoning on the compensatory damages issue. In effect, we affirm the result below—a complete denial of compensatory damages to an aggrieved victim of discrimination—without scrutinizing the legal reasoning upon which it depends.

A doubtful proposition should not become the law of this case merely because the parties may assume it to be so, either before the district court or in framing their arguments on appeal. By affirming the district court's

legal ruling denying compensatory damages without addressing the legal question of the availability of compensatory damages under Title II squarely on the merits, we would appear to be abdicating an appellate court's crucial role in the correction of legal error.

For the reasons explained above, I would reverse the district court's April 20, 1994 Order striking Tyler's claim for compensatory damages under Title II of the ADA.