RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0107p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────────

GREG ADKISSON et al.,

*Plaintiffs-Appellees*,

*v.*

No. 21-5801

JACOBS ENGINEERING GROUP, INC.,

*Defendant-Appellant*.

─────────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
Nos. 3:13-cv-00505; 3:13-cv-00666; 3:14-cv-00020; 3:15-cv-00017; 3:15-cv-00274;
3:15-cv-00420; 3:15-cv-00460; 3:15-cv-00462; 3:16-cv-00635;
3:16-cv-00636—Thomas A. Varlan, District Judge.

Argued:  March 11, 2022

Decided and Filed:  May 18, 2022

Before:  SUTTON, Chief Judge; GILMAN and ROGERS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Theane Evangelis, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California, for Appellant.  Mark E. Silvey, MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC, Knoxville, Tennessee, for Appellees.  **ON BRIEF:**  Theane Diana Evangelis, Theodore J. Boutrous, Jr., Peter S. Modlin, Jeremy S. Smith, GIBSON, DUNN & CRUTCHER, Los Angeles, California, Dwight E. Tarwater, Catherine Williams Anglin, PAINE TARWATER BICKERS LLP, Knoxville, Tennessee, J. Isaac Sanders, William J. Harbison II, NEAL & HARWELL, PC, Nashville, Tennessee, for Appellant.  Mark E. Silvey, Louis W. Ringger, III, William A. Ladnier, MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC, Knoxville, Tennessee, for Appellees.  David D. Ayliffe, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Amicus Curiae.

———————

**OPINION**

———————

RONALD LEE GILMAN, Circuit Judge.  This consolidated action involves a group of plaintiffs who worked, or had spouses or next of kin who worked, on the Tennessee Valley Authority's (TVA's) coal-ash cleanup, removal, and recovery project at the Kingston Fossil Fuel Plant (the Plant) in Roane County, Tennessee.  Plaintiffs sued Jacobs Engineering Group, Inc. (Jacobs)—an entity that has served as the TVA's prime contractor for the coal-ash cleanup since February 2009—for numerous common-law torts.

After this court reversed and remanded the district court's initial decision to dismiss the case for lack of jurisdiction, the district court bifurcated the case and proceeded with Phase I to determine whether Jacobs should be held generally liable to Plaintiffs.  A jury found that Jacobs had a duty to Plaintiffs, that Jacobs breached that duty, and that Jacobs's actions were a potential cause of Plaintiffs' alleged injuries.  Phase II, which has not yet occurred, is intended to assess specific causation with respect to individual Plaintiffs and the extent to which they are entitled to damages.

Both before and after Phase I of the trial, Jacobs filed motions seeking derivative immunity from suit based on its status as a government contractor.  The district court denied Jacobs's motions.  Jacobs subsequently filed yet another motion seeking derivative immunity based on what it claimed were intervening changes in the applicable law.  The district court construed the motion as one for reconsideration under Rule 54(b) of the Federal Rules of Civil Procedure.  It again denied Jacobs's motion.  This interlocutory appeal concerning Jacobs's alleged immunity followed.  For the reasons set forth below, we **AFFIRM** the district court's denial of derivative contractor immunity.

## I. BACKGROUND

The TVA is a corporation created by the Tennessee Valley Authority Act of 1933 and, as such, is wholly owned by the United States government.  *See* 16 U.S.C. §§ 831 *et seq.*; *see also Hill v. U.S. Dep't of Labor*, 65 F.3d 1331, 1333 (6th Cir. 1995).  It owns, operates, and manages

the Plant in question. *Chesney v. Tenn. Valley Auth.*, 782 F. Supp. 2d 570, 572 (E.D. Tenn. 2011). One of the containment dikes that retained a pond used to dispose of coal-ash sludge—a waste by-product from the Plant—failed in December 2008. This failure caused approximately 5.4 million cubic yards of coal-ash sludge to spill from the 84-acre containment pond to an adjacent area of about 300 acres.

The TVA and the Environmental Protection Agency (EPA) responded to the spill pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 *et seq.* (CERCLA), and the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. §§ 300.1 *et seq.* *See Mays v. Tenn. Valley Auth.*, 699 F. Supp. 2d 991, 998 (E.D. Tenn. 2010). After an initial emergency-response phase, and pursuant to CERCLA and Executive Order No. 12,580, the EPA delegated its authority to the TVA to serve as the lead federal agency on the cleanup and to engage in coal-ash-removal actions. *Id.* (citing 42 U.S.C. §§ 9604(a)–(b), 9615; 40 C.F.R. § 300.5). All coal-ash response and removal actions have been within the TVA's delegated authority under CERCLA and Executive Order No. 12,580 since January 11, 2009. *Id.*

Pursuant to a written contract, executed in February 2009, the TVA engaged Jacobs to provide professional services associated with management of the coal-ash recovery project (the Jacobs/TVA contract). The Jacobs/TVA contract provides "for project planning, oversight and environmental services to assist TVA in the Kingston Dredge Cell Incident recovery and remediation" and designates Jacobs as the TVA's "prime contractor providing project planning, management and oversight to assist TVA in overall recovery and remediation associated with this incident."

Part of Jacobs's role under the Jacobs/TVA contract was to evaluate the potential hazards to human health and safety associated with the work to be performed in execution of the ash-recovery-and-removal program. Jacobs was then required to prepare and submit for the TVA's approval a written site-specific safety and health plan called the Site Wide Safety and Health Plan. The Jacobs/TVA contract provides that Jacobs will abide by the Plan and "shall comply with Federal, State, and local laws (including regulations) affecting performance of its obligations" under the contract. It also requires that Jacobs "perform all work pursuant to the

technical requirements as provided by the Technical Contract Manager (TCM) and all applicable laws, codes, rules, and regulations in effect at the time of the services." In addition, Jacobs was to "be proactive in taking necessary measures to avoid accidents or incidents [in] which human health or safety is jeopardized."

This lawsuit arose because some of Jacobs's employees claim that they were exposed to coal ash (and its airborne particulate "fly ash") during this cleanup when Jacobs "did not carry out its validly conferred authority as an 'independent contractor' but, through its recklessly unsupervised agents, acted contrary to and outside its scope of contractual authority and directives in fact and law granted from TVA as an 'independent contractor.'" Adkisson, along with 48 other individuals, filed suit against Jacobs in the United States District Court for the Eastern District of Tennessee in August 2013, alleging claims of outrageous conduct, battery, negligence, negligence per se, intentional and/or reckless failure to warn, reckless infliction of emotional distress, fraud, misrepresentation and fraudulent concealment, and strict liability for ultrahazardous or abnormally dangerous activity for the manner in which Jacobs conducted the cleanup and exposed workers to the coal ash. In November 2013 and again in January 2014, additional Plaintiffs filed substantially similar suits against Jacobs in the same jurisdiction. *See Thompson et al. v. Jacobs Eng'g Grp., Inc.*, No. 3:13-CV-666; *Cunningham et al. v. Jacobs Eng'g Grp., Inc.*, No. 3:14-CV-20. Jacobs moved to dismiss all three actions pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. In July 2014, the assigned magistrate judge granted a motion by the *Thompson* Plaintiffs to consolidate the three cases with *Adkisson*—as the first case filed—serving as the lead case.

Two months later, the district court dismissed all of Plaintiffs' claims against Jacobs based on a lack of subject-matter jurisdiction. It found that Jacobs was entitled to derivative immunity as a corollary of the discretionary-function exception to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671 *et seq*.

A timely appeal of that decision followed. We reversed the district court's dismissal, holding that derivative immunity under *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), is not jurisdictional. The district court therefore erred in dismissing the case under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Adkisson v. Jacobs Eng'g Grp., Inc.*

*(Adkisson I)*, 790 F.3d 641, 645 (6th Cir. 2015).  On remand, the district court was instructed to conduct a Rule 12(b)(6) analysis to consider (1) whether Jacobs was eligible for derivative immunity, and (2) whether Jacobs's conduct would fall under the corollary of the discretionary-function exception to the FTCA.  *Id.* at 648–49.

This court, in its decision, commented on the merits of both questions that it remanded back to the district court.  First, the court addressed the question of Jacobs's derivative immunity under *Yearsley*.  It concluded that Plaintiffs' complaints "could plausibly be construed as alleging that Jacobs violated the scope of its agreement with TVA" and, moreover, that Jacobs "did not comply with Federal and State laws or regulations and that Jacobs acted in a manner that was converse to statutory authorization and TVA's contractual directives" in a manner that would prevent derivative immunity from extending to Jacobs.  *Id.* at 648 (internal quotation marks omitted).

Second, this court addressed the question of Jacobs's immunity under the FTCA's discretionary-function exception.  It noted that, "[e]ven if the district court determines that Jacobs is eligible for *Yearsley* immunity, Jacobs's exemption from liability will depend on whether its specific conduct at issue would fall under the corollary of the discretionary-function exemption of the FTCA."  *Id.*  The court identified the following two-part test that governs the discretionary-function exception: (1) "the conduct must be discretionary, meaning that it involves an element of judgment or choice," and (2) "the conduct must also be of the type that the discretionary-function exception was designed to shield."  *Id.* (citations and internal quotation marks omitted).

During the pendency of the appeal, five additional lawsuits were filed in or removed to the district court.  After remand, the court consolidated all of these cases with *Adkisson*.  Plaintiffs then filed an amended complaint in the consolidated cases.  In the amended complaint, over 60 former employees sought $50 million in compensatory damages and $25 million in punitive damages.  Plaintiffs later increased the punitive-damages claim to $3 billion in their second amended complaint.  Jacobs filed a motion to dismiss based on derivative immunity pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure in response to the second

amended complaint. The parties then jointly filed a motion to convert the motion to dismiss into a motion for summary judgment, which the court granted.

Jacobs argued in the converted motion for summary judgment that it was entitled to immunity under two theories, one of which the Sixth Circuit had not contemplated in *Adkisson I*. First, Jacobs argued that it was entitled to derivative immunity under *Yearsley*. Jacobs next argued that it was entitled to immunity under *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016), a case that the Supreme Court decided several months after this court decided *Adkisson I*.

The district court denied Jacobs's motion for summary judgment under both theories. Regarding the first theory, the court found that derivative discretionary-function immunity under *Yearsley* did not apply because Jacobs would be entitled to such immunity "'only if it adhered to the terms of its contract with the government,' *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 345 (4th Cir. 2014), and 'executed the will of the government.' *Chesney* [*v. Tenn. Valley Auth.*, 782 F. Supp. 2d 570, 582 (E.D. Tenn. 2011)]." The court found that there were genuine disputes of material fact as to whether Jacobs acted within the scope of its authority when performing the acts that gave rise to Plaintiffs' claims. Specifically, the court concluded that Jacobs would have acted contrary to the government's will if Jacobs

(1) did not randomly select workers for mobile monitoring;

(2) manipulated the monitoring results;

(3) did not inform TVA safety officials of repeated complaints regarding health problems due to fly ash;

(4) did not honor prescriptions for dust masks or respirators;

(5) communicated to workers that fly ash was safe to consume; and/or

(6) threatened workers when they asked for dust masks or respirators.

Regarding Jacobs's second theory, the court rejected Jacobs's argument that *Campbell-Ewald* expands derivative immunity and provides a new test wherein "government contractors are immune from third-party suits for work performed within the scope of their contracts, unless a Plaintiff establishes that the contractor failed to comply with explicit or clearly established government directions or requirements." The court also concluded that, even if this alleged new

test applied, a jury could find that Jacobs failed to meet it because of the genuine disputes of material fact listed above.

As trial approached, the district court granted Jacobs's motion to bifurcate the trial into two phases. Phase I would involve issues and evidence concerning "(1) whether defendant owed plaintiffs a legal duty; (2) whether defendant breached that duty; and (3) whether defendant's breach was capable of causing plaintiffs' alleged injuries." Phase II would "involve specific causation with respect to individual plaintiffs, each individual plaintiff's alleged injuries, and the extent to which individual plaintiffs are entitled to damages."

At the close of the evidence presented during Phase I, Jacobs filed several motions for a judgment as a matter of law. One of those motions argued that Jacobs was entitled to derivative immunity as a government contractor. The district court denied these motions. It then instructed the jury as follows regarding the immunity issue:

> In rendering the services at issue, Defendant was required to comply with the requirements established in the contract between Defendant and TVA, which I will refer to as the contract, and in the Site Wide Safety and Health Plan for the Kingston site, which I will refer to as the safety and health plan.
>
> Defendant was not permitted to deviate from the requirements in the safety and health plan without express approval from TVA and the Environmental Protection Agency.
>
> Defendant is not immune from suit for such deviations. I have ruled that Defendant would be acting contrary to the will of the government and is not immune from suit if Defendant, A, deliberately manipulated or tampered with any monitoring results or processes, B, did not inform TVA safety officials of repeated complaints regarding health problems due to fly ash, C, failed to comply with the provisions of the safety and health plan with respect to the voluntary use of dust masks, D, threatened workers when they asked for dust masks or respirators, E, communicated to workers that fly ash was safe to consume, or, F, otherwise failed to train or warn workers about the dangers of excessive fly ash exposure.
>
> Again, Defendant is not entitled to immunity for any of these acts or omissions which would be contrary to the will of the government and in violation of its obligations to TVA.

When Phase I concluded, the jury returned a verdict in favor of Plaintiffs. But the jury did not designate any particular theory, as listed in the jury instructions, for which Jacobs could

be held liable.  The jury instead broadly found that Jacobs had "failed to adhere to the terms of its contract with TVA, or the requirements set forth in the Site Wide Safety and Health Plan for the Kingston Site."

Jacobs then filed a mandamus petition that raised a Seventh Amendment reexamination claim based on the Phase I verdict and the failure to identify which of the six theories applied. This court denied the mandamus petition because Jacobs had an adequate remedy on appeal after final judgment.

In December 2018, Jacobs filed a motion for a judgment as a matter of law or, in the alternative, for a new trial, under Rule 50(b) of the Federal Rules of Civil Procedure.  Jacobs again argued that it was entitled to derivative immunity.  The district court denied the motion based on the law-of-the-case doctrine, which "provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Musacchio v. United States*, 577 U.S. 237, 244–45 (2016) (citation and internal quotation marks omitted).  It also found that that Jacobs did not properly preserve its objection to the jury instructions.

In June 2020, Jacobs filed a renewed motion for a judgment as a matter of law.  The motion argued that *Thacker v. Tennessee Valley Authority*, 139 S. Ct. 1435 (2019)—a case decided two months after the district court's rulings on Jacobs's post-trial motions—changed the derivative-immunity analysis in a manner that demanded the court's reexamination.  Jacobs also argued in the renewed motion that *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016), compelled the court to find that Jacobs was immune from suit. The district court construed the motion as a motion for reconsideration under Rule 54(b).  It again denied Jacobs's motion.

In March 2021, the district court certified an order for interlocutory review pursuant to 28 U.S.C. § 1292(b).  This court granted Jacobs's petition for permission to appeal pursuant to § 1292(b) in August 2021.  After hearing oral argument on March 11, 2022, we asked the Circuit Court Clerk to issue a letter to the TVA for the purpose of giving the TVA the opportunity to file an amicus brief in this case.  The TVA filed an amicus brief on April 11, 2022 concerning the

issue of whether the TVA would have been entitled to immunity from suit if Plaintiffs had included it as a party.

## II. STANDARD OF REVIEW AND THE FACTUAL RECORD

### A. Standard of review

Jacobs filed its post-verdict motion for a judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure. But, according to the district court, the motion "essentially s[ought] reconsideration of the [district] Court's denial of Jacobs's summary judgment and Rule 50(b) motions on the issue of derivative immunity based on an intervening change of law." In determining how to categorize the motion, the district court noted that this type of motion would ordinarily be brought under Rule 59(e) of the Federal Rules of Civil Procedure, which allows for a motion to alter or amend a judgment. But the court correctly reasoned that the bifurcated nature of the trial made Rule 59(e) inapplicable because no final judgment has been rendered. Because the Phase II issues are still pending, the court properly concluded that the instant motion should instead be considered a motion for reconsideration of an interlocutory order under Rule 54(b) of the Federal Rules of Civil Procedure.

> Rule 54(b) states in relevant part that
>
> any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

The Rule allows district courts to reconsider interlocutory orders and to reopen any part of a case before the entry of a final judgment. *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 952 (6th Cir. 2004) (first citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983); and then citing *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991)).

We ordinarily review a district court's decision to reopen a part of the case under Rule 54(b) using the deferential abuse-of-discretion standard. *Id.* at 952–53 (citing *Am. Canoe Ass'n, Inc. v. Murphy Farms*, 326 F.3d 505, 514–15 (4th Cir. 2003)). But neither party is challenging

the district court's decision to reopen this part of the case. Rather, Jacobs challenges the substance of the district court's decision. Jacobs urges us to employ the de novo standard in reviewing the substance of the decision, and Plaintiffs do not identify any other standard of review that we ought to employ. Because the questions before us are "purely legal . . . , we review the district court's decision *de novo*." *See Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (citing *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003)) (reviewing the district court's decision to deny injunctive relief de novo even though a district court's decision to deny injunctive relief is typically reviewed under the abuse-of-discretion standard).

## B. Factual record

In rendering its decision on the Rule 54(b) motion, the district court considered only the evidence submitted at the summary-judgment stage because this was the evidence that it deemed relevant in determining whether Jacobs's six acts or omissions subjected Jacobs to liability. But "once trial has been had, . . . the availability of official immunity should be determined by the trial record, not the pleadings nor the summary judgment record." *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011) (alterations, citation, and internal quotation marks omitted). To the extent that our decision requires an analysis of the factual record, we will therefore rely upon the evidence presented by the parties in Phase I of the trial.

## III. ANALYSIS

The United States, as a sovereign entity, is immune from suit unless it consents to be sued. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). Under the FTCA, the United States has waived its sovereign immunity with regard to tort suits, with several exceptions. 28 U.S.C. § 2674, *et seq*. One of those exceptions is for discretionary functions "whether or not the discretion involved [is] abused." 28 U.S.C. § 2680(a). This court examined in *Adkisson I* whether discretionary-function immunity applied to Jacobs derivatively. We instructed the district court to render findings on that question. But, after this court rendered its decision and the district court conducted its analysis on remand, the Supreme Court decided *Thacker v. Tennessee Valley Authority*, 139 S. Ct. 1435 (2019). *Thacker* concluded that the discretionary-

function exception does not apply to the TVA because "[n]othing in the statute establishing the TVA (again, the TVA Act for short) expressly recognizes immunity for discretionary functions." 139 S. Ct. at 1440. Rather, "that law provides simply that the TVA '[m]ay sue and be sued.'" *Id.* (alteration in original) (quoting 16 U.S.C. § 831c(b)).

Our analysis must therefore change from the one that this court employed in *Adkisson I*. First, we must address whether the TVA would be immune under *Thacker*. Jacobs cannot benefit from derivative immunity if the TVA itself is not immune. Second, if we determine that the TVA would be immune under *Thacker*, then we must decide whether the district court employed the proper test in determining which of Jacobs's acts and omissions were not protected by derivative immunity. The following analysis addresses these two questions in turn.

**A. Would the TVA have been immune from this lawsuit?**

We first address the question of whether the TVA would have been immune from suit if Plaintiffs had sued it. Because *Thacker* is instrumental in this analysis, we begin with an overview of that case. *Thacker* involved a boating accident that occurred when the TVA was conducting work to replace a power line that ran across the Tennessee River. During the work, a cable that TVA employees were using broke and caused the power line to fall into the water. The TVA notified the Coast Guard, which closed that portion of the Tennessee River, and the TVA positioned two patrol boats near the line. Gary Thacker nevertheless drove his boat into the area at a high speed, and his boat collided with the power line. His passenger died, and Thacker was seriously injured. Thacker sued the TVA for negligence. The district court granted the TVA's motion to dismiss based on sovereign immunity, and the Eleventh Circuit affirmed.

When the case reached the Supreme Court, the Court emphasized that Congress, in creating the TVA, wrote a sue-and-be-sued clause into the statute. This clause provides that the TVA can "sue and be sued in its corporate name." *Thacker*, 139 S. Ct. at 1439 (quoting 16 U.S.C. § 831c(b)). Congress enacted the FTCA to waive tort immunity after it created the TVA. *Id.* It carved out an exception to this waiver for incidents involving federal employees performing a "discretionary function." *Id.* at 1439–40 (quoting 28 U.S.C. § 2880(a)).

But Congress also carved out an exception to this waiver for "[a]ny claim arising from the activities of the [TVA]." *Id.* at 1440 (alterations in original) (quoting 28 U.S.C. 2680(l)).

After emphasizing the importance of the sue-and-be-sued clause and the unique nature of the TVA as a hybrid entity that engages in both commercial and governmental activity, the Supreme Court concluded that suits based on the TVA's commercial activity may proceed as they would against a private company. The TVA is therefore not immune from suit and is just "as liable as [private companies] for choices and judgments" that it makes when it operates in a purely commercial context. *Id.* at 1443. The Supreme Court also established that, even if a party sues the TVA for noncommercial, governmental activity, the sue-and-be-sued clause provides a "broad" immunity waiver that demands a "liberal construction." *Id.* Given this legislative context, the bar for the TVA to demonstrate that the immunity waiver does not apply is "high." *Id.* Any immunity protecting the TVA when it is acting in a noncommercial, governmental activity would apply only "if one of the following circumstances is 'clearly shown': either the 'type[] of suit [at issue is] not consistent with the statutory or constitutional scheme' or the restriction is 'necessary to avoid grave interference with the performance of a governmental function.'" *Id.* at 1441 (alterations in original) (quoting *Fed. Hous. Admin. v. Burr*, 309 U.S. 242, 245 (1940)).

Based on the framework laid out in *Thacker*, we first ask whether the coal-ash cleanup is a nongovernmental activity, i.e., "the kind of thing any power company might do." *Id.* at 1444. We then ask whether this type of suit is inconsistent with the statutory or constitutional scheme (the inconsistency inquiry) and whether prohibiting this type of lawsuit is necessary to avoid grave interference with the performance of the TVA's governmental function (the grave-interference inquiry). *Id.* at 1441, 1444.

### 1. Is the coal-ash cleanup a governmental activity?

As Jacobs acknowledged during oral argument, there is not much caselaw that delineates the type of action that would be commercial versus the type of action that would be governmental in this context. The most instructive caselaw that we find on point is *Thacker*'s list of the type of actions that would be governmental as opposed to commercial. This list

includes the TVA's exercise of eminent domain and its law-enforcement powers. *Id.* at 1443. On the spectrum of governmental versus commercial activities, these examples define the far pole of governmental activity.

This raises the question of where on the spectrum the TVA falls when it is designated as the lead federal agency of a cleanup by the EPA under circumstances where the TVA is cleaning up its own mess. No private power company could be designated as the "lead agency" of a cleanup. *See* Executive Order 12,580 ("[T]he functions vested in the President" by the hazardous-substance section of CERCLA "are delegated to the heads of . . . agencies," and removal of the hazardous materials is "under the jurisdiction, custody, or control of those . . . agencies."). But a private power company can be required to clean up environmental damage of its own making. *See, e.g.*, *United States v. Duke Energy Carolinas, LLC*, 499 F. Supp. 3d 213, 215–17 (M.D.N.C. 2020) (involving a private power company that was required to remediate its own coal-ash spill).

Because we conclude that the "inconsistency inquiry" and the "grave-interference inquiry" do not protect the TVA from liability in this case, we have no need to decide where the TVA's cleanup of this coal-ash spill falls on the spectrum of governmental versus commercial activity. We will therefore focus our analysis on the two *Thacker*-required inquiries set forth in subparts 2 and 3 below.

### 2. *The inconsistency inquiry*

In its amicus brief, the TVA argues that, if Plaintiffs had filed this lawsuit against the TVA, (1) the lawsuit would have been inconsistent with the applicable state workers' compensation regime, and (2) the lawsuit would have been inconsistent with, and precluded by, the Supremacy Clause and CERCLA. Jacobs failed to address the TVA's first argument in its appellate briefing. The only way that this issue has come to our attention is through the amicus brief that the TVA filed after oral argument. Before addressing this argument, we must determine whether the workers' compensation issue is properly before us. Jacobs made no argument in its brief regarding such a defense. It argued only that state regulation of the TVA's activities would constitute a grave interference with a governmental function. We must therefore

consider whether we can address the workers' compensation argument, given that only the TVA's amicus brief has raised it.

### i. Can we consider arguments raised only in the TVA's amicus brief?

This court has not definitively held that we can consider an argument raised solely in an amicus brief. *See Bormuth v. County of Jackson*, 870 F.3d 494, 530 n.1 (6th Cir. 2017) (Moore, J., dissenting) ("[T]he Supreme Court has held that it can consider arguments raised only by amicus. If the Supreme Court considers arguments raised only by amicus, there is no reason this court should not do so as well." (citing *Davis v. United States*, 512 U.S. 452, 457 n.* (1994)). Other circuits have held that courts of appeals "clear[ly]" have "the discretion to reach arguments raised only in an *amicus curiae* brief." *Tyler v. City of Manhattan*, 118 F.3d 1400, 1404 (10th Cir. 1997) (citing *Teague v. Lane*, 489 U.S. 288, 300 (1989)). But these circuits have held that "[i]t is equally clear, however, that we should exercise that discretion only in exceptional circumstances." *Id.*; *see also Swan v. Peterson*, 6 F.3d 1373, 1383 (9th Cir. 1993) (observing that, except for a few minor exceptions, "we do not consider on appeal an issue raised only by amicus."). Such exceptional circumstances exist "only when (1) a party attempts to raise the issue by reference to the *amicus* brief; or (2) the issue 'involves a jurisdictional question or touches upon an issue of federalism or comity that could be considered sua sponte.'" *Tyler*, 118 F.3d at 1404 (quoting *Swan*, 6 F.3d at 1383).

In this case, the first exceptional circumstance does not apply to the workers' compensation argument because Jacobs did not raise any argument related to workers' compensation in its briefing. The second exceptional circumstance requires a closer analysis. As the TVA points out in its amicus brief, this court has previously held that the Federal Employees Compensation Act (FECA), which provides workers' compensation benefits for federal employees, precludes tort suits against the TVA for the injury or death of TVA employees. *Turner v. TVA*, 859 F.2d 412, 415 (6th Cir. 1988). But the TVA cites no case to demonstrate that FECA would apply to Jacobs's employees in a manner that would implicate federalism and impact our consideration of Plaintiffs' state tort-law claims. Rather, the TVA argues that state workers' compensation laws preclude personal-injury suits against the TVA by contractor employees working at TVA project sites. Because this argument does not "involve[] a

jurisdictional question or touch[] upon an issue of federalism or comity that could be considered sua sponte," *see Tyler*, 118 F.3d at 1404, this argument does not fall under the second exceptional circumstance.

Our decision not to consider the workers' compensation argument is strengthened by the fact that Jacobs forfeited this argument when it failed to raise the argument either before the lower court or in its appellate filings. In Tennessee, workers' compensation immunity is an affirmative defense. Tenn. R. Civ. P. 8.03; *see also Stephens v. Home Depot U.S.A., Inc.*, 529 S.W.3d 63, 76 (Tenn. Ct. App. 2016) ("Tennessee Rule of Civil Procedure 8.03 lists affirmative defenses that must be raised in a pleading to a preceding pleading. One of those affirmative defenses is 'workers' compensation immunity.'" (internal citation omitted)). Under Rule 8(c) of the Federal Rules of Civil Procedure, a defendant must plead an affirmative defense in its response to a pleading. Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."); *see, e.g.*, *Troxler v. Owens-Illinois, Inc.*, 717 F.2d 530, 532–33 (11th Cir. 1983) (concluding that the defendant waived its affirmative workers' compensation defense when it raised the argument only on appeal); *Seal v. Indus. Elec., Inc.*, 362 F.2d 788, 789 (5th Cir. 1966) (concluding that a claim of statutory immunity under Mississippi's workers' compensation scheme was an affirmative defense that the defendant failed to raise).

"The purpose of Rule 8(c) of the Federal Rules of Civil Procedure is to give the opposing party notice of the affirmative defense and a chance to respond." *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997). Plaintiffs never had an opportunity to respond to the workers' compensation argument because Jacobs forfeited the affirmative defense. Rendering a decision based on the workers' compensation argument would therefore be unfair to Plaintiffs. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("[T]he fairness concerns that underlie the rule preventing issues not raised in the district court from being raised on appeal strongly point toward a finding of waiver.").

Although Jacobs failed to raise the workers' compensation argument that the TVA raised in its amicus brief, Jacobs did raise an argument concerning state regulation of a federal agency that is similar to the TVA's argument that this lawsuit would have been inconsistent with and

precluded by the Supremacy Clause and CERCLA if Plaintiffs had filed the lawsuit against the TVA. Jacobs raised this argument solely in regard to the grave-interference inquiry, not the inconsistency inquiry. Nonetheless, because the argument "touches upon an issue of federalism," *see Tyler*, 118 F.3d at 1404, we will analyze it under both inquiries.

### ii. Would Plaintiffs' lawsuit against the TVA be inconsistent with the Supremacy Clause and CERCLA?

We first assess whether Plaintiffs' suit would have been inconsistent with and precluded by the Supremacy Clause and CERCLA, as the TVA argues in its amicus brief. Our analysis begins with the Supremacy Clause argument. Under the Supremacy Clause, "the constitution and the laws made in pursuance thereof are supreme; [] they control the constitution and laws of the respective States, and cannot be controlled by them." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 426 (1819). Thus, "the activities of the Federal Government are free from regulation by any state." *Hancock v. Train*, 426 U.S. 167, 178 (1976) (quoting *Mayo v. United States*, 319 U.S. 441, 445 (1943)). A state regulation can violate the Supremacy Clause either by directly regulating the federal government or by conflicting with an affirmative command of Congress. *See M'Culloch*, 4 Wheat. 316, 425–37; *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824).

The TVA argues that, if it had been sued, Plaintiffs' lawsuit would have been precluded "by the interaction of the Supremacy Clause with the TVA Act and other statutes." To support this contention, the TVA cites *Hancock*. In *Hancock*, Kentucky sought to require federal installations discharging air pollutants to obtain state permits before operating. Although the Supreme Court recognized that the Supremacy Clause does not bar "all state regulation which may touch the activities of the Federal Government," the Court concluded that Kentucky's regulations "place[d] a prohibition on the federal government" that was not specifically contemplated by Congress in the Clean Air Act. 426 U.S. at 179–80; *see id.* at 198–99.

We are not persuaded by the TVA's reliance on *Hancock* because the case before us involves only common-law claims. The case of *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992), is instructive on this point. In *Cipollone*, the Supreme Court considered whether Congress's regulation of cigarette labels and advertising preempted state-tort actions.

The plaintiffs argued that manufacturers should be subject to state-tort liability even though they complied with federal labeling requirements enacted under the Public Health Cigarette Smoking Act. This Act specifies that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are [lawfully] labeled." *Id.* at 515.

When the plaintiffs sued the cigarette company for damages based on state common-law claims, the Supreme Court concluded in *Cipollone* that the federal regulations did not preempt those claims. *Id.* at 519–20. A cornerstone of the Court's analysis was the tenet that "[c]onsideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.'" *Id.* at 516 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). We apply the same assumption to this case.

The TVA argues that Plaintiffs' lawsuit against the TVA would have been inconsistent with CERCLA because the lawsuit "would interfere with [the TVA's] actions in remediating a site as the lead federal agency under CERCLA." It argues that CERLCA would have preempted any lawsuit that Plaintiffs filed against the TVA because the lawsuit would have alleged that the TVA, "in its role as the CERCLA lead agency, should have established stricter minimum safety standards" in the Site Wide Safety and Health Plan. In making this argument, the TVA relies on *Bartlett v. Honeywell International Inc.*, 737 F. App'x 543 (2d Cir. 2018), an unpublished Second Circuit opinion. *Bartlett* involved a consent decree that governed a CERCLA cleanup site. The Second Circuit found that CERCLA preempted the plaintiffs' claims because most of the plaintiffs' claims "transparently attack[ed]—on the basis of state tort law—the consent decree itself, and not its implementation." *Id.* at 550.

We are not persuaded by the TVA's argument. Plaintiffs have not based their claims on the inadequacy of the Site Wide Safety and Health Plan. The suit is instead based on Jacobs's alleged failures to comply with the Plan's provisions. We have no need to delve into the merits of whether the TVA could have been held liable for these alleged failures. But we conclude that pursuing the suit under this theory would not have been preempted by CERCLA because the theory does not challenge the adequacy of the terms of the Site Wide Health and Safety Plan.

### 3. The grave-interference inquiry

Jacobs next argues that permitting this lawsuit to move forward would gravely interfere with the TVA's governmental function for two reasons. It first contends that, if the district court determined that the TVA and Jacobs were not immune from this lawsuit, then the court would essentially be allowing a state's tort laws to apply to a federal cleanup in a manner that would constitute a direct interference with federal activity. Second, Jacobs argues that the TVA will struggle to find government contractors in the future if the court does not consider Jacobs immune because those contractors could be liable for significant tort damages. Jacobs claims that this potential difficulty in engaging contractors constitutes a grave interference with federal operations.

In making the first argument, Jacobs relies on *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014). The Ninth Circuit in *Boeing* held that a United States Department of Energy contractor was immune from state-law claims because enforcing those state laws would "directly interfere[] with the functions of the federal government." *Id.* at 840. *Boeing* invalidated a California statute that authorized the state's Department of Toxic Substances to "mandate[] the ways in which Boeing renders services that the federal government hired Boeing to perform" and to "replace[] the federal cleanup standards . . . with the standards chosen by the state." *Id.*

Jacobs claims that if we do not consider Jacobs immune in this case, a state mandate similar to the one presented in *Boeing* will functionally replace the TVA's remediation program. It argues that the TVA would need to alter significant aspects of its remediation program—including its worker training and hazard-communication protocols, respiratory protection plan, internal reporting mechanisms, and testing regime—to adopt the standard of care provided in the six categories of tort liability identified by the district court. Such a need for alteration would allegedly disturb the federal agency's internal functions in a manner that constitutes grave interference.

We find Jacobs's comparison between this case and *Boeing* unpersuasive. In *Boeing*, the United States Department of Energy's authorizing statute was at issue. That statute does not have a sue-and-be-sued clause. The Ninth Circuit noted in *Boeing* that the defendant would have

been subject to the state law at issue if Congress had clearly authorized such regulation. *Id.* Here, unlike in *Boeing*, the sue-and-be-sued clause in the TVA's enabling statute demonstrates that these state-law claims can apply to the TVA "given Congress's enactment of so broad an immunity waiver—which demands . . . a 'liberal construction.'" *Thacker v. Tennessee Valley Authority*, 139 S. Ct. 1435, 1443 (2019).

Further, we are not persuaded by the argument that the TVA would need to alter significant aspects of its remediation program to adopt the standard of care provided in the six categories of tort liability identified by the district court. This argument is a mischaracterization of the district court's decision. As explained in the preceding analysis, the TVA and Jacobs simply needed to abide by the terms of their own agreement to avoid liability. They did not need to alter the terms of that agreement.

Jacobs's second argument as to why our decision to deny it immunity would amount to a grave interference is that the imposition of hefty punitive damages will cause the TVA problems in finding future government contractors if we do not consider Jacobs immune. The question that Jacobs presents is whether contractors will refuse to work with the TVA in the future because they might be held liable for significant damages. Given that this argument is predicated on speculation as to how future contractors might analyze risk, and given that Jacobs cites no caselaw to support it, we do not find the argument persuasive.

Moreover, we find ourselves in good company in determining that prohibiting this type of lawsuit is not necessary to prevent grave interference with the performance of the TVA's governmental functions. The grave-interference test was first announced in *Federal Housing Administration v. Burr*, 309 U.S. 242 (1940). Since the test was announced, "the Supreme Court and the majority of Courts of Appeals presented with this issue have concluded that the federal agency had not demonstrated grave interference." *Ala. One Credit Union v. Hutto & Carver, P.C.*, No. 7:18-cv-02102, 2020 WL 3959153, at *4 (N.D. Ala. July 13, 2020) (first citing *Loeffler v. Frank*, 486 U.S. 549, 556–57 (1988); then *F.D.I.C. v. Hulsey*, 22 F.3d 1472, 1480 (10th Cir. 1994); *A.L.T. Corp. v. Small Bus. Admin.*, 801 F.2d 1451, 1462 (5th Cir. 1986); then *Beneficial Fin. Co. of N.Y. v. Dallas*, 571 F.2d 125, 128 (2d Cir. 1978); then *May Dep't Stores Co. v. Williamson*, 549 F.2d 1147, 1148 (8th Cir. 1977); then *Standard Oil Div., Am. Oil Co. v.*

*Starks*, 528 F.2d 201, 204 (7th Cir. 1975); and then *Goodman's Furniture Co. v. U.S. Postal Serv.*, 561 F.2d 462, 464 (3d Cir. 1977)).

**B. Did the district court properly characterize the derivative-immunity test?**

Jacobs concedes that it is immune from suit only if the TVA is immune. As analyzed in Part A above, we conclude that the TVA would not have been immune from suit on the grounds that Plaintiffs' claims raise either "inconsistency" or "grave-interference" concerns. We therefore do not need to reach the question of whether the district court properly characterized the test for derivative immunity. Nor do we express any opinion regarding any other potential issues that the district court may consider on remand, including any issues regarding whether Jacobs is immune from punitive damages.

## IV. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the district court's denial of derivative contractor immunity.